RAY A. MYERS AND SHERRY MYERS, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

R. REESE MYERS AND JANE V. MYERS, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 89862, 89863, 91984, 91985. Filed April 17, 1964.

*John G. Gemmill,* for the petitioners.
*Thomas J. Sullivan,* for the respondent.

BRUCE, *Judge:* The respondent determined deficiencies in income tax as follows:

| Docket No. | Petitioner | Year | Deficiency |
|---|---|---|---|
| 89862 | Ray A. Myers and Sherry Myers | 1956 | $31,724.43 |
| 91984 | ____do____ | 1957 | 7,385.77 |
| 89863 | R. Reese Myers and Jane V. Myers | 1956 | 6,161.77 |
| 91985 | ____do____ | 1957 | 1,465.65 |

Certain items disallowed by respondent in the notices of deficiency were not contested by petitioners and the amounts of the deficiencies thereon were subsequently assessed and paid.

The respondent disallowed bad-debt deductions of $55,575.31 and $7,275.08 claimed on partnership returns for fiscal years ended in 1956 and 1957, respectively, of a partnership in which all of the petitioners except Jane were members. The sole issue is whether such amounts are allowable deductions, either as business bad debts or as ordinary and necessary expenses of the partnership. Some facts are stipulated.

FINDINGS OF FACT

The stipulation of facts and exhibits thereto are incorporated herein by this reference. These facts are stated here to the extent deemed necessary, together with other facts found from the testimony.

Petitioners Ray A. Myers and Sherry Myers are husband and wife. R. Reese Myers is their son. Petitioners R. Reese Myers and Jane V. Myers are husband and wife. All are residents of Los Angeles, Calif., and each of the married couples filed joint returns for the years 1956

and 1957, with the director of internal revenue at Los Angeles. Since Jane is involved herein solely by reason of having filed a joint return with her husband, use of the term "petitioners" will hereinafter have reference to Ray, Sherry, and Reese Myers.

Petitioners Ray A. Myers, Sherry Myers, and R. Reese Myers are, and at all times since 1941 have been, copartners, doing business as Myers Bros., a partnership. Myers Bros. is, and at all times mentioned has been, engaged in the general contracting business and holds licenses from the State of California and various other Western States as a general contractor. The principal place of business of petitioners and of Myers Bros. is, and at all times mentioned has been, in Los Angeles, Calif. The partnership accounts were kept and returns filed on the basis of a fiscal year ended October 31.

Myers Bros. has been engaged in housing construction, both military and nonmilitary, and has also done construction of commercial, industrial, and service-station buildings.

Between 1944 and 1956, Myers Bros. engaged in the construction of the following nonmilitary housing projects:

| Name of project | Year | Approximate gross sales |
|---|---|---|
| Elbe Construction Co | 1944–45 | $305,200 |
| Culver City Housing Corp | 1946–47 | 10,000,000 |
| Laurel Canon Manor Co | 1947–48 | 586,100 |
| Rhodes Development Co | 1947–48 | 447,500 |
| Strathern Development Co | 1947–48 | 447,500 |
| St. Clair Development Co | 1947–48 | 447,500 |
| Bellingham Development Co | 1947–48 | 447,500 |
| Glade Development Co | 1947–48 | 447,500 |
| Stagg Development Corp | 1947–48 | 468,600 |
| Laurel Canon Development Corp | 1947–48 | 468,600 |
| Woodset Development Corp | 1947–48 | 468,600 |
| Highland Development Co., Project No. I | 1948–49 | 381,000 |
| Highland Development Co., Project No. II | 1950–51 | 396,800 |
| Highland Development Co., Project No. III | 1950–51 | 269,800 |
| Highland Development Co., Project No. IV | 1951–52 | 413,000 |
| Highland Development Co., Project No. V | 1951–52 | 182,500 |
| Lambert Housing Corp | 1949–50 | 1,637,000 |
| Myers-Smith, Inc., Project No. I | 1949–50 | 850,000 |
| Myers-Smith, Inc., Project No. II | 1954–55 | 460,000 |
| Fred J. Russell | 1953–54 | 739,250 |
| Hancock Homes, Inc | 1950–51 | 1,700,000 |
| Merit Homes, Inc | 1950–51 | 344,500 |
| Rayden Building Co | 1950–51 | 600,000 |
| Marine Terrance, Inc | 1951 | 3,226,400 |
| Northridge Co | 1951 | 840,000 |
| Allondra Park, Inc., Project No. I | 1951–52 | 1,331,400 |
| Allondra Park, Inc., Project No. II | 1952–53 | 2,290,000 |
| Myers-Laguna Co | 1952–53 | 675,840 |
| A.F.G. Homes, Inc | 1952–53 | 585,000 |
| Myers-Yuma Homes, Inc | 1953 | 229,750 |
| Myers Bros.-Housing Land Co., Joint Venture | 1953 | 283,700 |
| Rodille Corp | 1953–54 | 567,500 |
| Rancho Vallejo Development Co., Inc., of California | 1954–55 | 1,362,400 |
| Brian Homes, Inc., Project No. I | 1954–55 | 308,600 |
| Brian Homes, Inc., Project No. II | 1954–55 | 377,100 |
| Calridge Homes, Inc | 1954–55 | 37,500 |
| Homes, Inc | 1954–55 | 1,503,350 |
| B-L-B Corp | 1954–55 | 550,400 |
| Highland-Ayres, Project No. I | 1954–55 | 905,800 |
| Highland-Ayres, Project No. II | 1955–56 | 751,200 |
| Myers-Simonsen Co | 1954–55 | 528,250 |
| Cortland Homes, Inc | 1954–55 | 667,600 |
| The Westshore Co. of San Mateo | 1955–56 | 1,950,000 |
| Myers-Bodger, Ltd | 1955–56 | 522,250 |
| Total | | 42,092,490 |

The above-listed projects were carried out under a variety of arrangements. Myers Bros. did the construction work, in most instances under contract with the corporation or other entity which owned or acquired the land, upon a cost-plus-fixed-fee (ranging from $100 to $250 per house) or a cost-plus-percentage-of-profits basis. In some instances the project was conducted as a joint venture between the landowners and Myers Bros. In a few instances Myers Bros. purchased the land for cash and constructed the houses on its own behalf. In some instances the corporation purchased the land, using its invested capital for this purpose. In others it acquired the land on a deferred-payment basis; i.e., for preferred stock to be redeemed after completion and sale of the houses or to be paid from sales escrows after completion and sale. In the latter instances only nominal capital was required since construction financing was obtained through conventional loans from banks or other lending institutions under FHA (Federal Housing Administration) or VA (Veterans' Administration) programs. In most of the corporation projects Myers Bros. or individual members of the partnership owned stock in the corporation, but in some instances neither the partnership nor its members owned any of the stock and merely contracted to erect the houses.

As to all of the above projects, the construction loans were personally guaranteed by Myers Bros., its partners and their spouses, either through direct guaranties, or through lump-sum construction contracts obligating Myers Bros. to perform and complete construction for the amount of the loan, or both. It was customary and usual for the partnership initially to advance the construction and development costs for which it obtained or expected to obtain reimbursement from construction-loan progress payments and proceeds of sales escrows.

The following are events preceding and covering the subdivision and development of tract 18866, city of Los Angeles:

Prior to, and during, the year 1951, Mollin Investment Co. (hereinafter referred to as Mollin), a corporation in which all of the common stock was owned by Christopher Hendra and Marcus L. Godfrey, Jr., owned a tract of land in Los Angeles, which was then zoned for, and used as, agricultural land.

In the year 1951, discussions were had between Hendra, Godfrey, and Myers Bros. concerning the possibility of developing a portion of such land.

On October 31, 1952, Blue Hill Development Corp. (hereinafter referred to as Blue Hill) was incorporated under the laws of California. On February 24, 1953, there was issued for cash at the par value of $1 per share, stock in the Blue Hill Development Corp., as follows: 45 shares to Myers Bros.; 22½ shares to Hendra; 22½ shares to Godfrey; and 10 shares to Forster and Gemmill.

On February 12, 1953, Mollin conveyed to Blue Hill 170.987 acres of land located within the city limits of Los Angeles, together with 142.8 acres located outside the city limits but contiguous to the city property. The purchase price for the city property was paid through the execution and delivery of a note secured by a deed of trust upon the property in the principal amount of $470,000, and the purchase price for the adjoining property was paid through a note secured by a deed of trust thereon in the amount of $285,000. In addition, there was paid, as a downpayment on account of both parcels of land, the sum of $1,000 in cash. Thereafter, the major portion of the city land was rezoned by the city for residential purposes.

On March 6, 1953, Calridge Homes, Inc., was incorporated under the laws of the State of California. On April 27, 1954, it issued for cash, par value $1 per share, 67½ shares of common stock to Marcus L. Godfrey, Jr., 135 shares to Myers Bros. and members of the Myers family, 67½ shares to Christopher Hendra, and 30 shares to Forster and Gemmill.

On April 27, 1954, in exchange for 37½ shares of its preferred stock of the par value of $100 per share, Calridge Homes acquired from Blue Hill a small parcel of land which subsequently became lots 11 to 13, inclusive, of tract 18866 and thereafter contracted with Myers Bros. to erect three houses on this parcel. This transaction is not involved herein.

On September 2, 1954, Calridge Homes acquired from Blue Hill approximately 12 acres of land, which was subsequently subdivided as lots 1 to 10, inclusive, and lots 14 to 54, inclusive, tract No. 18866. As consideration, Calridge Homes issued to Blue Hill 637½ shares of its preferred stock. Blue Hill pledged the Calridge Homes preferred stock to Mollin as substituted security, and Mollin released this land from its deed of trust.

Cortland Homes, Inc., was incorporated on October 31, 1952. On June 28, 1954, it issued for cash 100 shares of stock of the par value of $1 per share, 45 shares to Myers Bros., 22½ shares to Hendra, 22½ shares to Godfrey, and 5 shares each to Forster and Gemmill. These same shareholders (after various transfers) held the capital stock of Cortland Homes, Inc., in the same proportions from February 15, 1955, to August 1, 1956. Reese Myers, Hendra, and Gemmill were directors of Cortland Homes; Reese was its president and Gemmill its secretary. Godfrey, Hendra, Forster, and Gemmill are not related to petitioners.

On November 29, 1954, Cortland Homes bought from Calridge Homes lots 1 to 10, inclusive, and lots 14 to 54, inclusive, of tract 18866 for $65,025, for which amount Cortland Homes executed its promissory note payable in 1 year with interest at the rate of 5 percent

per annum from date of maturity and providing that $1,300 was to be paid to the holder thereof upon the close of the sales escrow for each of said lots, which amounts the maker assigned to the holder.

On December 31, 1954, the VA issued a "Master Certificate of Reasonable Value" covering the houses which Cortland Homes proposed to build on all of the 51 lots above mentioned except lots 28, 29, 30, and 44, under which the VA agreed, in effect, to guarantee loans to qualified purchasers after construction and sale of residential units thereon. The reasonable values placed thereon were in the amounts of $11,750 (3), $11,950 (14), and $12,300 (30), depending upon the house plans to be used. By letter dated December 9, 1955, the VA increased the reasonable values as to such units as had not then been sold or deposits made thereon at the former values, to $12,800, $13,000, and $13,675.

On or about January 1, 1955, Myers Bros. prepared a detailed estimate as to the cost of construction and lot improvements which it then anticipated erecting upon the 51 lots in tract 18866. This estimate was prepared in the manner customary in the construction industry, and was based upon a "take-off" of quantities of labor and materials from the plans and specifications, and upon firm bids from subcontractors. This estimate projected average cost and sales prices per unit and in the aggregate as follows:

| | | |
|---|---:|---:|
| Construction cost per unit | $9,892 | |
| Other | 1,563 | |
| Total | 11,455 | |
| Total cost, 51 lots | | $584,205 |
| Sales price per unit | 12,429 | |
| Sales price, 51 lots | | 633,879 |
| Profit per unit | 974 | |
| Profit, 51 lots | | 49,674 |

Cortland Homes contemplated the erection of 51 houses on the 51 lots which it had acquired in tract 18866. The construction contract (hereinafter mentioned) which it entered into with Myers Bros. as contractor, provided for the erection of 51 houses and this number was actually erected and sold. However, since the certificate of reasonable value issued by the VA on December 31, 1954, covered only 47 of the 51 lots, the construction loans and various documents hereinafter mentioned related only to the 47 lots covered by the VA certificate. Subsequently, on February 1, 1956, the VA issued a certificate of reasonable value for each of the other four lots and they were sold as improved.

On January 17, 1955, the board of directors of Cortland Homes authorized the borrowing of not to exceed $460,000 from the Bank of

America National Trust & Savings Association (hereinafter referred to as the Bank), the execution of various documents in connection therewith deemed necessary for the development of the 47 lots above mentioned, and the execution of a building construction contract with Myers Bros. as contractor.

On January 24, 1955, Cortland Homes executed building loan escrow instructions, a lien and bond waiver agreement, agreement to purchase loans, builder's agreement to purchase loans, Guaranty agreements relating to onsite and offsite improvements, and operative builder agreement, and 47 deed of trust notes in the principal amounts of $9,840 (30), $9,560 (14), and $9,400 (3), aggregating $457,240. Each of these notes was due, by its terms, on August 24, 1955, with interest from its date at the rate of 5 percent per annum, payable March 24, 1955, and monthly thereafter. All of these notes were secured by a single deed of trust in favor of the Bank, dated January 24, 1955, covering the 47 lots.

The above-mentioned agreement to purchase loans, builder's agreement to purchase loans, and the two guaranty agreements relating to onsite and offsite improvements, in addition to being executed by Cortland Homes and the Bank, were also executed by Myers Bros., petitioners Ray, Sherry, Reese, and Jane Myers, and by John G. and Evelyn C. Gemmill, as principals or guarantors, or had attached thereto a document executed by Myers Bros. and such individuals.

Under the agreement to purchase loans, Cortland Homes, Myers Bros., and the individuals agreed as principals to purchase from the Bank, for the unpaid principal balance and accrued interest, each of the so-called section 24 commercial loans (i.e., the loans made to Cortland Homes on each of the 47 lots), which had not been paid in full at maturity.

Under the builder's agreement to purchase loans, Cortland Homes agreed to purchase from the Bank, within 10 days after written demand, for an amount equal to the unpaid principal and interest plus any advances made by the Bank for the protection of its security, all Veterans' Administration loans made to individual purchasers. By a document attached thereto, Myers Bros. and the individuals mentioned guaranteed and agreed to pay to the Bank any and all indebtedness owing by Cortland Homes under this agreement.

Under the two guaranty agreements, Cortland Homes, Myers Bros., and the individuals mentioned, guaranteed the construction and completion of the residences to be erected on the 47 lots and the offsite improvements, and guaranteed the payment in full of all labor and/or materials used in connection with such construction and the completion of the residences and improvements free and clear of all mechanic's, labor, and/or materialmen's liens.

On January 24, 1955, Cortland Homes and Myers Bros. executed an indemnity agreement in favor of Title Insurance & Trust Co. whereby it agreed to hold and save that company harmless against all damages, costs, and charges which it might sustain by reason of title insurance policies thereafter issued guaranteeing the Bank and individual purchasers of the 51 lots in tract 18866 that the lots were free and clear of all mechanic's liens.

On January 24, 1955, Cortland Homes, as owner, and Myers Bros., as contractor, entered into a building construction contract, whereby Myers Bros., furnishing all labor, materials, tools, and equipment therefor, agreed to construct and complete a dwelling upon each of lots 1 to 10, inclusive, and lots 14 to 54, inclusive, of tract 18866, in accordance with the plans and specifications signed by the parties, and Cortland Homes agreed to pay Myers Bros. the actual cost of all labor, materials, and services furnished or rendered by the contractor in the erection of said structures, plus the sum of $100 for each of the structures, as profit to the contractor. The payment schedule provided for the payment of 20-percent progress payments keyed to the individual loan amounts shown on the schedule attached, as construction progressed.

On or about February 1, 1955, Myers Bros. began the construction of the houses and improvements on the 51 lots and, subject to the delays hereinafter mentioned, completed the same, including the 47 covered by the construction loans and the 4 additional houses, in February and March 1956. During construction, the proceeds of the construction loans were disbursed to and received by Myers Bros. as called for by the agreements between Cortland Homes, the Bank, and Myers Bros.

The terrain of the property on which the houses and improvements were erected and installed was sloping. Myers Bros. employed an independent engineering concern to lay out the lots and streets and set the grades for the lots. In so doing, the engineers made a serious error in setting the grades for the lots, which was not discovered until the rough grading was in progress during the summer of 1955. This error resulted in additional cost due to the necessity of moving approximately 25,000 yards of earth to the tract site from other locations and the erection of retaining walls between lots to comply with VA and public authority slope requirements.

On October 1, 1955, the local union of the International Brotherhood of Teamsters, Chauffeurs & Warehousemen of America, AFL, having jurisdiction and control of all workers and drivers in the sand and gravel industry serving Los Angeles County, Calif., called a strike of these workers. The strike lasted continuously from October 1, 1955, to December 31, 1955, and as a result no sand and gravel de-

liveries, and no ready-mix concrete and cement deliveries, were available for work on tract 18866. As of October 1, 1955, when the strike was called, construction of the houses and street improvements had advanced to the point where the interior and exterior of the houses were substantially completed, but curbs, streets, driveways, and walks had not been installed. As these activities required sand and gravel, ready-mix concrete, and cement, practically all work on the tract was suspended during the 3-month period of the strike. Sales were also virtually suspended for want of ready and convenient access of customers to the houses.

The extension of the construction period caused by the strike resulted in a substantial increase in interest cost on the construction loan over that originally estimated and reasonably contemplated. Also, due to a depression in the loan market which occurred between the commencement of the project and the delayed completion and closing of the escrows, the loan discount, originally estimated to cost $19,635, actually cost $33,347.25.

Additional expenses were also incurred by reason of Myers Bros. having to complete with its own crews carpentry work subcontracted to another party which became insolvent during the progress of the work, and by reason of having to install "dry sewers" in addition to the septic tanks originally planned, in compliance with an unanticipated requirement of the city of Los Angeles.

After termination of the strike, construction was resumed and the houses and improvements were completed and sold. A notice of completion as to 17 of the lots was recorded on February 9, 1956, and as to 34 of the lots on April 2, 1956.

As a result of the engineering error, the sand and gravel strike, the city's requirement as to dry sewers, additional carpentry labor cost, increased loan discount cost, and interest cost, the aggregate costs exceeded the original estimate and caused a loss on the project as a whole in the amount of $62,850.39.

By letter dated March 14, 1956, Calridge Homes, without affecting the obligation of Cortland Homes to pay the full amount of the promissory note dated November 29, 1954, waived the provision thereof requiring the payment of $1,300 per lot from the sales escrows and reduced the amount to be paid from the sales escrows to $785 per lot, and directed that such reduced amounts be paid to Blue Hill for the account of Calridge Homes. Thereafter the Bank disbursed the $785 per lot received from sales escrows to Blue Hill, and Calridge Homes credited such amounts to the account of Cortland Homes. When all escrows were closed, Blue Hill paid the aggregate thereof to Mollin and it was applied to Blue Hill's note to Mollin. This payment discharged the pledge of preferred stock in Calridge Homes to Mollin

and a portion thereof was redeemed by Calridge Homes as a result of these transactions.

The sales of the houses were handled through individual escrows at the Bank. All but two of the individual escrows covering the 51 houses and lots sold were closed between March 29 and June 21, 1956. Two were closed on August 31, 1956.

As each escrow closed, a new note and deed of trust, executed by the buyer and guaranteed by the VA, were recorded. Each such note was in the amount of the sale price of the house and lot as previously established by the amended certificate of reasonable value previously issued by the VA. The trustee under the blanket deed of trust executed, and there was recorded, a partial reconveyance releasing the particular lot from the blanket deed of trust. The Bank returned to Cortland Homes, as fully paid, the separate deed of trust note secured by the blanket deed of trust initially intended to apply to that particular lot.

The Bank disbursed funds arising from the escrow and resulting from the new VA guaranteed loan, and "impounds" deposited by the purchaser as follows:

(1) To the payment of principal and any unpaid interest of the Cortland Homes note, except as to lots 28, 29, 30 and 44, as to which no construction loans existed;

(2) To the payment of escrow title policy and miscellaneous expense;

(3) To the payment of $785 to Blue Hill for the account of Cortland Homes, pursuant to the terms of the note as modified by the letter dated March 14, 1956 and instructions from Cortland Homes;

(4) To a reserve account in connection with the agreement to repurchase loans; and

(5) To Myers Bros. for the account of Cortland Homes.

Through the end of its fiscal year, October 31, 1956, Myers Bros. had expended $644,384.31 in erecting the buildings and improvements on the 51 lots in tract 18866 and had received reimbursement, either through progress payments from the Bank under the building construction loans to Cortland Homes or through remittances from the closing of escrows and sales to individual customers, in the aggregate amount of $588,809, or $55,575.31 less than the amount expended.

As of the close of its fiscal year ended October 31, 1957, Myers Bros. had expended an additional $7,281.13 in connection with the project and had received reimbursement during that fiscal year in the amount of $6.05.

The sale prices of the 51 lots sold through the escrows, exclusive of impounds deposited by the purchasers to cover miscellaneous escrow and other expenses, amounted to a total of $666,945.

The difference between the aggregate sale prices and the total receipts by Myers Bros. consists of the aggregate of the Bank loan fees

charged, interest charged by the Bank during construction and until the close of the escrows, respectively, and by the discount charged by the Bank against Cortland Homes under the agreements to repurchase loans.

In disbursing loan proceeds through the sales escrows, the amount deducted and held by the Bank was 5 percent of the sale price through the escrows. The aggregate amount so placed in this reserve was $33,347.25.

The Bank thereafter sold to Federal National Mortgage Association the 51 loans and charged against the fund so withheld the difference between the face value of the loans so sold and the price received by the Bank for the loans, less service charges and marketing fees. Such charges completely consumed the fund, resulting in a deficit owing to the Bank. The Bank later collected the deficit from Myers Bros.

As of October 31, 1956, Cortland Homes had no assets and was indebted to Myers Bros. in the amount of $55,575.31. As of October 31, 1957, Cortland Homes had no assets and was indebted to Myers Bros. in the additional sum of $7,275.08. Myers Bros. has not recovered any part of this indebtedness.

As of October 31, 1956, and as of October 31, 1957, Cortland Homes, Inc., was insolvent, and was unable to pay the debts represented by the differences in Myers Bros.' costs and receipts, for each said year, namely, $55,575.31 for 1956, and $7,275.08 for 1957.

On the partnership information return for the fiscal year ended in 1956 a deduction for a bad debt was claimed in the amount of $55,-575.31 with the explanation "Costs advanced on housing project uncollectible as house costs exceeded loan and corporation has no funds—Cortland Homes, Inc." On the return for the fiscal year ended in 1957 an additional amount of $7,275.08 was claimed as a bad debt deduction. The construction and development costs paid and incurred by Myers Bros. under the contract with Cortland Homes were ordinary and necessary business expenses of the partnership. The partners reasonably expected repayment from construction loan proceeds and sales escrows.

The amounts of $55,575.31 and $7,275.08, paid by the partnership, Myers Bros., in its fiscal years ended in 1956 and 1957, respectively, representing the excess of costs and expenses over reimbursements, were not capital contributions to Cortland Homes but were losses incurred in connection with the trade or business of the partnership and constituted ordinary and necessary business expenses or business bad debts.

### OPINION

The question here presented is whether certain payments, made by petitioners through their partnership Myers Bros., in connection with

a housing project, to the extent not reimbursed, are deductible as bad debt losses or as ordinary and necessary business expenses.

Petitioners contend they were in the business of organizing, financing, and promoting corporations or ventures engaged in the development and sale of residential housing projects, and that the losses sustained by them in connection with the construction and development of the Cortland Homes project are deductible as business bad debts under the provisions of section 166[1] of the Internal Revenue Code of 1954. Additionally, they contend that the construction and development costs and expenses paid by them were ordinary and necessary expenses of their general contracting business and that, to the extent they were not reimbursed therefor, such payments are deductible under section 162[2] of the Internal Revenue Code of 1954.

Respondent contends that the advances made by petitioners in 1956 and 1957, in the amounts of $55,575.31 and $7,275.08, respectively, are not deductible by petitioners as business bad debts, under the provisions of section 166, or as ordinary and necessary business expenses, under the provisions of section 162, but were in reality capital contributions or gifts. In support of the contention that the advances in question were not business bad debts but actually capital contributions or gifts, respondent argues that there were none of the indicia of loans such as provisions for payment of interest or for security or even a written obligation or note; that Cortland Homes was thinly capitalized; that petitioners continued to advance labor, materials, funds, and services after the corporation became hopelessly insolvent and with no hope of repayment; and that petitioners made no effort to recover any of the advances by filing mechanic's liens. He further argues that, assuming the advances gave rise to a debt, it was not a debt proximately related to the trade or business in which petitioners were engaged.

---

[1] SEC. 166. BAD DEBTS.
    (a) GENERAL RULE.—
        (1) WHOLLY WORTHLESS DEBTS.—There shall be allowed as a deduction any debt which becomes worthless within the taxable year.

     \*        \*        \*        \*        \*        \*        \*

    (d) NONBUSINESS DEBTS.—
        (1) GENERAL RULE.—In the case of a taxpayer other than a corporation—
            (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and

     \*        \*        \*        \*        \*        \*        \*

        (2) NONBUSINESS DEBT DEFINED.—For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than
            (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or
            (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.
[2] SEC. 162. TRADE OR BUSINESS EXPENSES.
    (a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, \* \* \*

We agree that the petitioners were not engaged in the business, as such, of organizing, financing, and disposing of housing development corporations or of lending money. We think it abundantly clear, however, that petitioners, through their partnership, were engaged in the general contracting business, including the development and construction of residential housing projects for other corporate entities, partnerships, or ventures, and that the advances in question were not only related to but were ordinary and necessary expenses of such business.

In the instant case, Cortland Homes acquired a tract of land comprising 51 lots for which it executed its promissory note in the amount of $65,025, to be paid at the rate of $1,300 per lot (later reduced to $785 per lot), out of the proceeds to be received upon the close of the sales escrows to individual purchasers.

Prior to entering into a construction contract and financing arrangements, a certificate of reasonable value was obtained from the VA covering 47 of the 51 lots and houses to be built thereon. Myers Bros. also prepared a detailed estimate as to the cost of constructing the houses and improvements on the 51 lots and the sales prices to be received therefor. Total cost was estimated at $584,205 and total sales price at $633,879. The estimated gross profit to the corporation was in the amount of $49,674.

Thereafter, on January 24, 1955, Cortland Homes entered into a construction contract with Myers Bros., whereby Myers Bros. agreed to furnish all labor, materials, tools, and equipment necessary therefor and to construct and complete a dwelling upon each of the 51 lots in accordance with designated plans and specifications, and Cortland Homes agreed to pay Myers Bros. the actual cost of all such labor, materials, and services furnished or rendered, plus $100 for each of said structures as profit to the contractor. Payments were to be made in five payments of 20 percent each, keyed to the individual lot loan amounts, as construction progressed.

On the same date, January 24, 1955, in order to finance construction, Cortland Homes borrowed $457,240 from the Bank of America National Trust & Savings Association, for which it executed 47 notes secured by a single deed of trust covering 47 of the lots, and an escrow agreement, together with various other documents. The other four lots were not included in these financing arrangements because reasonable values had not been established for them by the VA at that time. Included in these documents were an agreement to purchase loans, a builder's agreement to purchase loans, and two guaranty agreements relating to onsite and offsite improvements, each of which, in addition to being executed by Cortland Homes and the Bank, were also executed

by Myers Bros., each of the petitioners, individually, and by John G. and Evelyn C. Gemmill.

Under these agreements, Cortland Homes, Myers Bros., and the individuals mentioned guaranteed the construction and completion of the 47 residences and improvements and the payment in full of all labor and materials used thereon, free and clear of all mechanic's, labor, and materialmen's liens. They also agreed to purchase from the Bank each of the loans made on the 47 lots not paid at maturity and upon demand all VA loans made to individual purchasers.

In addition, in anticipation of the Bank construction loan and the sale of the houses and lots to individual purchasers, on January 12, 1955, Cortland Homes and Myers Bros. executed an indemnity agreement in favor of the Title Insurance & Trust Co., in effect guaranteeing completion of the houses and improvements free and clear of all mechanic's liens.

In view of the fact that the land was acquired on a deferred payment basis and construction costs were substantially financed by means of construction loans, both payable upon the closing of sales escrows to individual purchasers, and since the total sales price based upon reasonable values established by the VA were reasonably expected to exceed the total estimated cost by approximately $50,000, we do not think the "thin corporation" doctrine, as contended by respondent, is applicable.

Nor do we think the absence of a written obligation or note negates the characterization of the advances as business debts. Under the construction contract Myers Bros., and therefore petitioners, was obligated to furnish the necessary labor and materials and to complete the construction of the houses and improvements on the 51 lots, and, as required by the various documents implementing the project, such completion was to be free and clear of all mechanic's, labor, and materialmen's liens. Payment for the labor, materials, and services furnished and rendered was to be made as construction progressed in accordance with a specified schedule. The last two of the progress payments, or 40 percent, were not payable until the work was completed, "Notice of Completion and Acceptance" recorded, and the structure ready for occupancy.

It had been expected that the funds derived from the construction loan, plus the income reasonably to be expected from the sale of the four additional houses not covered by the construction loan, would be sufficient to meet such payments. However, because of the unforeseen events enumerated in our findings of fact, total costs exceeded total receipts in the aggregate amount of $62,850.39. Myers Bros., as required of it under the construction contract and various imple-

menting documents executed by it, made such advances as were necessary to complete the construction and to sell the houses free and clear of labor, mechanic's, and materialmen's liens. Upon its doing so a debtor-creditor relationship was created, under the construction contract, between Cortland Homes and Myers Bros. We think Myers Bros., and petitioners individually, were required to make such advances even though Cortland Homes might not be able to meet its obligation to reimburse the partnership. Accordingly, it is immaterial that Cortland Homes may have been insolvent at the time of such advances. In this connection it is to be noted (notwithstanding respondent's contentions on brief to the contrary) that the parties have in effect stipulated that the amount of the advances here in question represented debts owing to Myers Bros. by Cortland Homes: "As of October 31, 1956, and as of October 31, 1957, Cortland Homes, Inc., was insolvent, and was unable to pay the debts represented by the differences in Myers Bros.' Cost and Receipts, for each said year, namely $55,575.31 for 1956, and $7,275.08 for 1957." Also, though stipulated that Cortland Homes was insolvent as of October 31, 1956, and October 31, 1957, there is no evidence as to when or at what stage Cortland Homes *became* insolvent.

It is also obvious that, in view of its contractual commitments, Myers Bros. was not in position to file mechanic's liens of its own. Nor would this have been a practical thing to do since it would have held up payment of 40 percent of the progress payments and have caused it greater loss. Myers Bros. did succeed in reducing the loss by obtaining a reduction in the amounts to be paid Calridge Homes for land costs upon the close of the sales escrows and by obtaining increases in the "reasonable values" established by the VA as to certain of the lots.

In *Whipple* v. *Commissioner*, 373 U.S. 193 (1963), the Supreme Court held that "Devoting one's time and energies to the affairs of a corporation is not of itself, and without more, a trade or business of the person so engaged," and, to the extent that it rested upon the determination that the petitioner therein was not in the business of organizing, promoting, managing, or financing corporations, of bottling soft drinks, or of general financing and moneylending, affirmed the decision of this Court that the advances there involved to a controlled corporation resulted in nonbusiness bad debts. Taking note, however, of the fact that the petitioner was the owner and lessor of the real estate and bottling plant in which the corporation did business, the Supreme Court remanded the case for determination whether the worthless debt was not proximately related to petitioner's business of being a landlord.

In the present case, we have found that petitioners were not engaged in the business, as such, of organizing, financing, and disposing of housing development corporations or of lending money. We have further found, however, that petitioners, through their partnership, were engaged in the general contracting business, including the development and construction of residential housing projects for other corporate entities, partnerships, or ventures, and that the advances in question were not only related to, but were ordinary and necessary expenses of such business. *Whipple* supports our determination.

In *Wachovia Bank and Trust Co.* v. *United States*, 288 F. 2d 750 (C.A. 4, 1961), the court held that certain advances in the aggregate amount of $98,336.17 made by trustees to a corporation organized and wholly owned by the trustees, for the purpose of reconditioning and making a leased hotel suitable for commercial operation and for operating expenses, were capital contributions and not loans, where the corporation had been capitalized for only $5,000 and it was estimated at the time the venture was entered into that it would take $50,000 to $60,000 to put the property in operating condition, to pay monthly rentals and certain required deposits.

Here, although Cortland Homes was capitalized at only $100, the land had been acquired on a deferred payment basis; a bank loan had been obtained for construction purposes, and it was reasonably expected that sales escrow receipts would not only be sufficient to pay for land costs and construction cost but would result in a profit of approximately $50,000 to the stockholders. Under the circumstances we have found and hold that the advances in question were not capital contributions.

In *Putnam* v. *Commissioner*, 352 U.S. 82 (1956), the Supreme Court held that where an attorney as guarantor executed notes with a corporation in which he was a shareholder, the amount the attorney was compelled to pay on the notes as guarantor constituted a nonbusiness bad debt which was deductible as a short-term capital loss incurred in a transaction entered into for profit but not connected with any trade or business of the taxpayer.

In that case the taxpayer was an attorney who in 1945, in a venture not connected with his law practice, organized a publishing company with two others, a newspaperman and a labor leader, to publish a labor newspaper. Each received one-third the issued capital stock. Putnam supplied the property and cash with which to start business and, for the short time it was in business, also financed its operations through advances and guaranties of salaries and debts. Shortly before the venture was abandoned, Putnam acquired the stock of the other shareholders and in July 1947, as sole stockholder, wound up

its affairs and liquidated its assets. The proceeds were insufficient to pay the full amount due a bank on two notes given by the corporation and guaranteed by Putnam for moneys borrowed in August 1946 and March 1947.

In the instant case, petitioners were partners in a general contracting business engaged in the development and construction of residential housing projects. Together with two land owners and two attorneys unrelated to them, they organized a corporation to develop a residential housing project containing 51 lots. Petitioners' partnership acquired 45 of the 100 $1-par-value shares of stock issued, each of the land owners acquired 22½ shares, and each of the attorneys acquired 5 shares. The corporation acquired the land on a deferred payment basis and a construction loan was obtained from a bank. Both the land cost and the construction loan were to be paid upon completion out of sales escrows to individual purchasers of the houses, reasonably estimated to be sufficient to cover such costs and return a profit of approximately $50,000. Petitioners did not sign any of the notes as principals or guarantors and only indirectly guaranteed the construction loan by obligating themselves under the construction contract and implementing agreements to complete the construction of the houses and improvements free and clear of all mechanic's, labor, and materialmen's liens. Such agreements were customary in the housing construction field. Under the construction contract the petitioners through their partnership agreed to furnish all labor, materials, and tools necessary to complete the houses, in return for which the corporation agreed to pay the partnership the actual cost of all labor, materials, and services plus the sum of $100 per house, payments thereof to be keyed to construction progress. As was required of it under the construction contract and other documents executed by it in connection therewith, Myers Bros. made such advances as were necessary to complete construction free and clear of mechanic's, labor, and materialmen's liens. Upon its doing so, the corporation became indebted to Myers Bros. Because of the unforeseen events referred to in our findings, however, total costs exceeded total receipts and since the proceeds from the construction loan and sales escrows were insufficient to cover the excess costs, and it had no other assets, the corporation was unable to pay the debt owed by it to the partnership. The advances made by petitioners through their partnership were not only related to its general contracting business but were ordinary and necessary expenses of such business. The facts and circumstances clearly distinguish this case from the *Putnam* case.

We hold that the amounts in question constituted business bad debts or ordinary and necessary expenses of the partnership and are accord-

ingly deductible by petitioners under section 166 or 162 of the Internal Revenue Code of 1954.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

WITHEY and HOYT, *JJ.*, concur in the result.

TIETJENS, *J.*, dissents.