# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

—————

No. 18-20585

—————

United States Court of Appeals
Fifth Circuit

**FILED**
November 21, 2019

Lyle W. Cayce
Clerk

BAKER HUGHES, INCORPORATED,

Plaintiff–Appellant

v.

UNITED STATES OF AMERICA

Defendant–Appellee

—————

Appeal from the United States District Court
for the Southern District of Texas

—————

Before SOUTHWICK, WILLETT, and OLDHAM, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

In this dispute over an income tax deduction, the taxpayer appeals the decision of the district court that a $52 million payment from its predecessor in interest to the predecessor's subsidiary was not a bad debt under 26 U.S.C. § 166 or an ordinary and necessary business expense under 26 U.S.C. § 162. Therefore, no income tax deduction was allowed for the payment. We AFFIRM.

## FACTUAL AND PROCEDURAL BACKGROUND

During the relevant time period, BJ Services Company, which the parties have referred to as "BJ Parent" and so shall we, conducted fracking services in Russia. It operated through a Russian subsidiary, ZAO Samotlor Fracmaster Services, which also has an agreed shortform, "BJ Russia." The

plaintiff Baker Hughes is the successor in interest to BJ Parent. In 2006, BJ Russia entered into a three-year contract with OJSC TNK-Management ("TNK-BP"), a joint venture between Russian National Oil company TNK and British Petroleum, to provide fracking services in Siberia. TNK-BP could terminate this contract if BJ Russia became bankrupt, if a liquidator was appointed for BJ Russia, or if BJ Russia defaulted on its contractual obligations. During the three-year term of the contract, BJ Russia did not default, and TNK-BP never claimed it had.

As a condition of BJ Russia's bidding on this contract, TNK-BP required BJ Parent to provide a guarantee that BJ Parent would perform or ensure the performance of the fracking services that TNK-BP asked BJ Russia to provide. The final version of this guarantee in part provided:

> 1. We [BJ Parent] guarantee that [BJ Russia] shall duly perform all its obligations contained in the Contract.

> 2. If [BJ Russia] shall in any respect fail to perform its obligations under the Contract or shall commit any breach thereof, we undertake, on simple demand by [TNK-BP], to perform or to take whatever steps may be necessary to achieve performance of said obligations under the Contract and shall indemnify and keep indemnified against any loss, damages, claims, costs and expenses which may be incurred by [TNK-BP] by reason of any such failure or breach on the part of [BJ Russia].

BJ Russia sustained unanticipated losses on the contract in 2006 and 2007. BJ Russia decided to exit the Russian market. Nevertheless, it was critical that BJ Russia not breach its contract. In September 2008, BJ Russia informed TNK-BP of its intention not to renew the contract; it would exit the Russian market after BJ Russia fulfilled its contractual obligations.

By letter dated October 21, 2008, the Russian Ministry of Finance informed BJ Russia that it was not in compliance with Articles 90 and 99 of the Civil Code of the Russian Federation. Those provisions require a joint stock company, such as BJ Russia, to maintain net assets in an amount at least

equal to the company's chartered capital. A company may reduce its chartered capital to match the level of its net assets, but Russian Law establishes a minimum level for chartered capital. The Ministry explained that if a company's net assets are less than the minimum level for chartered capital at the end of the financial year, then the company is subject to liquidation by the Russian taxing authority. In the letter, the Ministry provided calculations showing that BJ Russia's net assets were less than the chartered capital minimum for both 2006 and 2007. Based on these calculations, the Ministry determined that the Russian "tax authority ha[d] the right to claim the liquidation of the company through the court." (underlining in original). The Ministry required BJ Russia to provide by November 14, 2008, information regarding actions taken to "improve [its] financial performance and increase the net assets in 2008."

BJ Russia responded to the Ministry in a letter dated November 13, 2008. In this letter BJ Russia stated that it "was taking steps to improve the financial and economic activities of the company and to increase the net assets in 2008" but did not specify what these steps were. The issue in this case is how to classify, for tax purposes, BJ Parent's actions in response to the Ministry's letter.

BJ Parent made wire transfers totaling $52 million to BJ Russia. The transfer caused BJ Russia's net assets to be greater than its chartered capital, and the transfer ended the risk of liquidation. This transfer of funds was made as "Free Financial Aid" ("FFA") under a provision of the Tax Code of the Russian Federation. The finance manager of BJ Parent's non–United States affiliates described FFA as "just giv[ing] money . . . with no repayment obligation, ever." Under the Russian Tax Code, assets received by an organization from its majority shareholder without consideration are exempt from a profit tax. According to an email exchange between the BJ Parent

finance manager and BJ Parent tax counsel, BJ Parent considered a transfer of funds via FFA as the most "tax efficient" way to provide BJ Russia with the capital needed to satisfy the net-asset requirements of Russian law. Had BJ Parent failed to prevent BJ Russia's liquidation, BJ Parent estimates that its losses would have been at least $160 million.

To be eligible for the tax exemption under Russian law, the FFA had to be given on behalf of BJ Russia's majority shareholder. BJ Russia and its majority shareholder, also a subsidiary of BJ Parent, entered into an "Agreement on Provision of Free Financial Aid" on November 26, 2008, whereby BJ Parent would transfer funds in the form of FFA to BJ Russia on behalf of the majority shareholder. The agreement stated that "[t]he Shareholder confirms hereby that its financial assistance is free and that it does not expect [BJ Russia] to return the funds to the Shareholder." The parties agree that BJ Russia had no obligation to repay BJ Parent for the provision of the FFA. The FFA was characterized in a BJ Russia shareholder meeting as a "free capital contribution" from BJ Parent to BJ Russia. BJ Russia used at least part of the $52 million BJ Parent wired to BJ Russia to partially repay a loan from another BJ Parent subsidiary. As a result of the FFA, BJ Russia's net assets increased, resolving the undercapitalization problem identified in the Ministry letter.

BJ Parent claimed the $52 million FFA provided to BJ Russia as a "bad debt expense" on its United States income tax return for fiscal year 2008. The Internal Revenue Service ("IRS") disallowed the deduction. The IRS stated that BJ Parent failed to support that this transaction should be considered a "bad debt or guaranteed debt" as allowed by Section 166 of the Internal Revenue Code. Taxpayer BJ Parent also had not shown that payment should be deductible as an ordinary and necessary business expense under Section

No. 18-20585

162 or entitled to a deduction under any other section of the Internal Revenue Code. Instead, the IRS considered the payment to be a capital contribution.

Baker Hughes, as the successor in interest to BJ Parent, filed this suit in the United States District Court for the Southern District of Texas. It sought a refund for 2008 in the amount of $17,654,000, plus interest. Baker Hughes alleged that BJ Parent was entitled to a bad-debt deduction under 26 U.S.C. § 166 for the payment it made to BJ Russia. The district court later permitted Baker Hughes to assert an additional claim that the FFA was a deductible ordinary and necessary business expense under 26 U.S.C. § 162.

As to both claims, the district court granted summary judgment to the Government. Baker Hughes timely appealed.

DISCUSSION

We review a district court's "grant of summary judgment *de novo*, applying the same standards as the district court." *Ibarra v. UPS*, 695 F.3d 354, 355 (5th Cir. 2012). Summary judgment is appropriate if the movant demonstrates "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). When cross-motions for summary judgment have been ruled upon, "we review each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Green v. Life Ins. Co. of N. Am.*, 754 F.3d 324, 329 (5th Cir. 2014). Baker Hughes bears "the burden of proving entitlement to a claimed deduction." *BC Ranch II, L.P. v. Comm'r*, 867 F.3d 547, 551 (5th Cir. 2017). Here, few facts are in dispute. The controlling issues are ones of law.

No. 18-20585

I.     *Section 166: Bad-debt deduction*

Section 166 of the Internal Revenue Code states that "[t]here shall be allowed as a deduction any debt which becomes worthless within the taxable year."  26 U.S.C. § 166(a)(1).  A taxpayer may claim a bad-debt deduction only for a *bona fide* debt, which is defined as a "debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money."  Treas. Reg. § 1.166-1(c).  "A gift or contribution to capital shall not be considered a debt for purposes of section 166."  *Id.*  For taxpayers who have entered into an agreement to act as a guarantor of a debt obligation, "a payment of principal . . . in discharge of part or all of the taxpayer's obligation as a guarantor . . . is treated as a business debt becoming worthless in the taxable year in which the payment is made," Treas. Reg. § 1.166-9(a), and the payment is thus deductible under Section 166. If the payment constitutes a contribution to capital, it is not treated as a worthless debt, and it thus is not deductible under Section 166.  *See* Treas. Reg. § 1.166-9(c).

The district court reasoned that the $52 million in payments from BJ Parent to BJ Russia did not itself create an indebtedness and was not a deductible bad debt under Section 166.  The FFA agreement was explicit that there would be no repayment, and indeed Russian law required that no obligation to repay be created by an FFA.

On appeal the parties agree that BJ Russia had no obligation to repay the $52 million to BJ Parent.  Nonetheless, Baker Hughes argues that the payment to BJ Russia fulfilled BJ Parent's guarantee obligation and was entitled to a bad-debt deduction pursuant to Treasury Regulation § 1.166-9. The district court agreed that a guarantee payment may qualify as a bad-debt deduction when there is "an enforceable legal duty upon the taxpayer to make the payment."  Treas. Reg. § 1.166-9(d)(2).  Voluntary payments, though, do

6

not qualify because "[a] gift or contribution to capital shall not be considered a debt for purposes of section 166." Treas. Reg. § 1.166-1(c).

According to Baker Hughes, it does not matter that there is no underlying repayment obligation. To support its position, it cites to Tax Court decisions[1] and to authority outside the Fifth Circuit for the proposition that a guarantor's losses are deductible under Section 166 even in the absence of a legal right to repayment. For example, the Sixth Circuit held that a guarantor's payments to creditor-lessors represented payments to cover the debt of the debtor-lessee and were thus deductible as bad debts pursuant to Section 166; that was true even though the guarantor had no legal right to repayment. *United States v. Vaughan (In re Vaughan)*, 719 F.2d 196, 198–99 (6th Cir. 1983). Baker Hughes also cites a Third Circuit decision where the court recognized that the taxpayer had gained no right of subrogation through its guarantee, but its payments to creditors on behalf of the debtor should nonetheless be considered "bad debts within section 166." *Stratmore v. United States*, 420 F.2d 461, 464 (3d Cir. 1970). In addition, Baker Hughes quotes one Tax Court opinion for the proposition that "even without the existence of a technical right of subrogation, a guarantor's loss is in the nature of a bad debt loss, and, thus, is subject to the bad debt regime of section 166." *Black Gold Energy Corp. v. Comm'r*, 99 T.C. 482, 486–87 (1992) (summarizing holdings of *Vaughan* and *Stratmore*).

We agree with the Government's response to these arguments. The sort of guarantee contemplated by Section 1.166-9(a) is for a taxpayer's payments that are "in discharge of part or all of the taxpayer's obligation as a guarantor."

---

[1] The Tax Court is an Article I court. *Estate of Smith v. Comm'r*, 429 F.3d 533, 537 (5th Cir. 2005). Tax Court opinions and memorandum opinions are persuasive authority. *See, e.g.*, *Chemtech Royalty Assocs., L.P. v. United States*, 823 F.3d 282, 290–92 (5th Cir. 2016) (considering both a Tax Court opinion and a memorandum opinion as persuasive).

That means a guarantor can claim a bad-debt deduction only if the creditor could have claimed such a deduction were it not for the guarantor's payment of the underlying debt. Baker Hughes' authorities all involved a *bona fide* debt. In *Vaughan*, the taxpayer-guarantor made payments directly to the creditors to discharge his obligation as guarantor. There was a *bona fide* debt from the debtor-lessee to the creditor-lessor which allowed for the taxpayer's bad-debt deduction. *See Vaughan*, 719 F.2d at 198–99. In *Stratmore*, the taxpayer's payments were in discharge of its obligation as guarantor of corporate notes, which constituted the *bona fide* debt. *See Stratmore*, 420 F.2d at 461.

No authority shown to us holds that a bad-debt deduction applies to a guarantor's payment on a guarantee that does not create a debtor-creditor relationship with the party whose original obligation is extinguished. "Only a *bona fide* debt qualifies for purposes of section 166. A *bona fide* debt is a debt which arises from a debtor-creditor relationship." Treas. Reg. § 1.166-1(c). One of Baker Hughes' cited opinions reiterates that "the guarantor's loss arises by virtue of the worthlessness of the debtor's obligation to the guarantor." *Black Gold*, 99 T.C. at 486–87. In other words, it is the debtor's obligation to the guarantor that creates the "bad debt" necessary for the deduction.

The Supreme Court has analyzed the sorts of guarantor payments that are deductible as bad debts. *See Putnam v. Comm'r*, 352 U.S. 82 (1956). There, the taxpayer made a payment to a creditor in discharge of the taxpayer's obligation as guarantor of corporate notes of a debtor. *Id.* at 83. The Court reasoned that a performed guarantee to pay a debtor's loan was a bad-debt deduction because upon paying the guarantee, the guarantor "step[ped] into the creditor's shoes." *Id.* at 85. When the guarantor was then unable to "recover from the debtor" the guaranteed and paid amount, the performed guarantee was functionally "a loss from the worthlessness of a debt." *Id.* The

taxpayer's ability to claim the bad-debt deduction as a guarantor was the result of the existence of an underlying debt.

The FFA itself imposed no obligation on BJ Russia to BJ Parent, and BJ Parent's obligations as guarantor imposed no obligation on BJ Russia. Indeed, there was no debt at all, good or bad. BJ Russia never failed to perform its contractual obligations with TNK-BP, and TNK-BP never called on BJ Parent to carry out its obligations as guarantor. As a result, there was no bad debt to support Baker Hughes' claim for a bad-debt deduction.

The *Putnam* Court distinguished between voluntary payments made while knowing there would be no repayment and payments that are made in compliance with a taxpayer's obligations as a contractual guarantor. *Id.* at 88. The former is considered a gratuity and not a deductible bad debt, while the latter is a loss that arises because the debtor is unable to repay the guarantor – making it a deductible bad debt. *Id.* This is consistent with Section 166's implementing regulations: "A gift or contribution to capital shall not be considered a debt for purposes of section 166." Treas. Reg. § 1.166-1(c).

We consider the FFA to have been a contribution to capital, as it was described by BJ Parent itself. We find relevant two sections of the regulations on Section 166. One states that a "contribution to capital shall not be considered a debt for purposes of section 166." Treas. Reg. § 1.166-1(c). In addition: "No treatment as a worthless debt is allowed with respect to a payment made by the taxpayer in discharge of part or all of the taxpayer's obligation as a guarantor . . . if, on the basis of the facts and circumstances at the time the obligation was entered into, the payment constitutes a contribution to capital by a shareholder." Treas. Reg. § 1.166-9(c).

The FFA was used to resolve the capitalization problem identified in the letter from the Russian Ministry. It therefore "closely resembles an

investment or contribution to capital," *Comm'r v. Fink*, 483 U.S. 89, 96–97 (1987), which is not deductible under Section 166.

The district court also concluded that the payment to BJ Russia did not discharge BJ Parent's obligation to perform as a guarantor as required by the regulations to qualify as the bad-debt deduction of a guarantor. *See Baker Hughes, Inc. v. United States*, 313 F. Supp. 3d 804, 810–11 (S.D. Tex. 2018). The district court considered that TNK-BP never looked to BJ Parent to carry out its guarantor obligations; none of the obligations under the guarantee agreement were discharged by the FFA; and the requirements of the guarantee remained unchanged after the FFA was transferred to BJ Russia. *Id.*

Baker Hughes contends this analysis was error because the letter from the Ministry was "effectively a demand" on BJ Parent's performance guarantee, and because "the receipt of the letter triggered the payment." Baker Hughes' position is that the Russian Federation controlled TNK-BP, and the Ministry letter was issued by an arm of the Russian Federation soon after BJ Russia informed TNK-BP that the contract would not be renewed. Consequently, Baker Hughes argues the letter must be construed as a demand on BJ Parent's performance guarantee. The Government disputes that the Ministry letter was such a demand. It relies in part on the fact that the letter, addressed to BJ Russia, makes no mention of BJ Parent, the performance guarantee, TNK-BP, or the contract between BJ Russia and TNK-BP.

Regardless of whether the letter was a demand, we conclude that BJ Parent discharged no guarantor obligation through its provision of the FFA. Notwithstanding TNK-BP's possible influence over the Ministry, BJ Parent's providing the money necessary to reduce the risk of BJ Russia's liquidation was a transfer of funds made to a subsidiary so that the subsidiary could satisfy Russian capitalization requirements. The district court correctly concluded that it was not a "payment of principal or interest . . . by the taxpayer in

discharge of part or all of the taxpayer's obligation as a guarantor." Treas. Reg. § 1.166-9(a). Therefore, it was not a deductible bad debt.

Baker Hughes argues that even if the Ministry letter was not a demand, BJ Parent was not required to wait until BJ Russia failed in its contractual obligations and BJ Parent was called on to perform on its guarantee agreement to claim a bad-debt deduction under Section 166. In support, Baker Hughes relies on a Tax Court case dealing with whether a taxpayer's advance payments, to the extent they were not reimbursed, were deductible as either bad debts or ordinary and necessary business expenses. *See Myers v. Comm'r*, 42 T.C. 195, 205 (1964). There, the taxpayers had entered into a construction contract with a developer whereby the taxpayers would construct homes, providing all necessary labor, materials, tools, and equipment; and the developer would pay the taxpayer for the cost of all such labor, materials, and services furnished or rendered. *Id.* at 205–06. In a guarantee agreement with the lender to finance the construction, the taxpayers and the developer had guaranteed the construction of the homes free and clear of all mechanic's, labor, and materialmen's liens. *Id.* at 207. In time it became clear that the home sales would not recoup costs, and the taxpayers made advance payments to the developer so that the requirements of the guarantee agreement would be met. *Id.* at 207–08.

Here, the district court distinguished *Myers* on the basis that the *Myers* court found the advances had created "a debtor-creditor relationship" between the developer and the taxpayer under the construction contract. *Id.* at 205, 206. The *Myers* court found that the payments were deductible as a bad debt because the taxpayers were required to make the advances to the developer under the terms of the guarantee agreement. *Id.* at 207–08, 210. Upon the taxpayers' making the advances, an obligation to repay arose that the

developer could not satisfy, allowing the taxpayers to claim the payments as a bad-debt deduction under Section 166. *Id.* at 210–11.

In contrast, no debtor-creditor relationship ever existed between BJ Parent and BJ Russia as to the $52 million. The FFA agreement stated that BJ Parent "confirms hereby that its financial assistance is free and that it does not expect [BJ Russia] to return the funds." Indeed, the parties agree that BJ Russia had no obligation to repay BJ Parent for the provision of the FFA. Because the district court's distinction regarding the existence of an underlying debt goes to the heart of why there is no bad-debt deduction here, we agree with the district court that Baker Hughes' reliance on *Myers* fails.

BJ Parent's $52 million payment to BJ Russia created no debt owed to BJ Parent, and the payment discharged no guarantor obligation of BJ Parent's. The payment is thus not deductible as a bad debt under Section 166.

II.    *Section 162: Ordinary and necessary business expense deduction*

Section 162 of the Internal Revenue Code states that "[t]here shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." 26 U.S.C. § 162(a). To qualify as a deduction under Section 162, an item must be (1) paid during the taxable year (2) for carrying on trade or business, and it must be (3) an expense that is both (4) ordinary and (5) necessary. *See Comm'r v. Lincoln Sav. & Loan Ass'n*, 403 U.S. 345, 352 (1971). Generally, the requirement that a payment be "ordinary" and "necessary" is not met when one taxpayer pays to satisfy the obligation of another taxpayer. *See Lohrke v. Comm'r*, 48 T.C. 679 (1967). Further, voluntary payments made by a stockholder to a corporation to benefit the financial position of the corporation cannot be claimed as a deductible business expense or loss. *See Schleppy v. Comm'r*, 601 F.2d 196, 197 (5th Cir. 1979). A shareholder's voluntary

contribution to capital of the corporation has no immediate tax consequences. *See Fink*, 483 U.S. at 94. Under regulations in effect at the time of the claimed deduction here, such contributions are considered capital investments and are not deductible. *See* Treas. Reg. § 1.263(a)-2(f) (2008).

The district court held that the FFA was not an "expense" of BJ Parent but instead was a non-deductible contribution to capital of BJ Russia, as contemplated by *Fink* and Treasury Regulation § 1.263(a)-2(f). The district court reasoned that BJ Parent provided the FFA so that BJ Russia could recapitalize its balance sheet to avoid the risk of suffering the consequences outlined in the Ministry letter.

Baker Hughes argues that *Fink* and *Schleppy* do not apply. In *Fink*, the taxpayers were individuals who "voluntarily surrendered some of their shares" to their corporation in an attempt to attract new investors to the company. 483 U.S. at 91. The Supreme Court compared "the voluntary surrender of shares" to "a shareholder's voluntary forgiveness of debt." *Id.* at 96. Even though the company's net assets did not change by the donation of shares, the Court saw the transaction as "closely resembl[ing] an investment or contribution to capital." *Id.* at 96–97. Consequently, no deduction was allowed. *Id.* at 99–100. In *Schleppy*, the taxpayers surrendered shares to their corporation to facilitate a transaction with a creditor. 601 F.2d at 196–97. Although the surrender did not increase the net assets in the corporation, we recognized the move was "to bolster the corporation's financial health," and the taxpayers were "left . . . in substantially the same position that they . . . held" before the surrender. *Id.* at 197–98. We concluded that with "a surrender of a very small part of [their majority ownership] stockholdings" to "improve [the company's] financial position," the transactions were best understood as non-deductible capital contributions. *Id.* at 199.

13

It is true, as Baker Hughes states, that the *Fink* taxpayers hoped to recover the value of the surrendered shares through increased dividends or appreciation in the value of their remaining shares and that the *Schleppy* taxpayers surrendered their holdings to improve the financial position of the corporation for future operations. Because BJ Parent provided the FFA to BJ Russia without expectation of recovery, Baker Hughes argues, the payment should not be categorized as a capital contribution. This argument focuses on the fact that BJ Russia eventually ended its operations in Russia. Regardless of that, the $52 million payment was made for the purpose of increasing BJ Russia's net assets. *Fink* did not turn on whether the taxpayers hoped to recover the value of their shares. The transfer was treated as a capital contribution because it was similar to the forgiveness of debt owed by the corporation. *Fink* 483 U.S. at 96–97. The FFA payment was used to reduce one of BJ Russia's debts, recapitalizing its balance sheet through reducing its liabilities and increasing its net equity. This same result would have occurred had BJ Russia kept the funds and not paid down the debt, and like the transfer in *Fink*, it "closely resembles an investment or contribution to capital." *Id.* at 96–97. The decision in *Schleppy* also did not turn on the taxpayers' hope that their actions would improve future business operations. Like here, the *Schleppy* taxpayers' transfer of shares was made to bolster the financial position of the corporation and was thus best understood as a capital contribution. 601 F.2d at 199.

In making its Section 162 argument, Baker Hughes relies mostly on an exception to the general rule that a payment by one taxpayer for the obligation of another taxpayer is not deductible as an ordinary and necessary business expense under Section 162. It relies on a Tax Court case for the proposition that such a payment is deductible if the following apply: (1) the taxpayer's purpose is to protect or promote the taxpayer's own business interests, and

No. 18-20585

(2) the rest of the Section 162 requirements are met *vis-à-vis* the taxpayer. *See Lohrke*, 48 T.C. at 684–85, 688.

The district court here held that the *Lohrke* exception did not apply because the FFA was not tied to any actual expense of BJ Russia. Baker Hughes does not effectively respond to the district court's reasoning that the cases in which the *Lohrke* exception was invoked included an underlying expense. In *Lohrke*, the taxpayer made a payment directly to a third-party entity who had sent an invoice to the taxpayer's corporation because the latter had insufficient cash to make the payment. *Id.* at 683. Baker Hughes' cases in support of its *Lohrke*-exception argument similarly involved an actual expense paid by the taxpayer. *See Coulter Elecs., Inc. v. Comm'r*, 59 T.C.M. (CCH) 350 (1990) (allowing parent company to deduct reimbursements made to wholly owned subsidiary to cover warranty expenses); *Gould v. Comm'r*, 64 T.C. 132, 134 (1975) (invoking *Lohrke* exception where taxpayer made payment directly to creditor in response to invoice from creditor sent to debtor corporation). The existence of some paid expense is no surprise, considering an "expense" is required for there to be an ordinary and necessary business expense deduction. *See* 26 U.S.C. § 162(a); *Lincoln*, 403 U.S. at 351. This requirement did not fall away under *Lohrke*. *See* 48 T.C. at 688.

Here, the FFA was not an expense of BJ Parent, and it was not provided to pay any expense of BJ Russia. Even if BJ Parent's long-term strategy included recapitalizing its Russian subsidiary to meet Russian capitalization requirements, this does not itself make the funds deductible. There must be an "expense" to support an ordinary and necessary business expense deduction under Section 162, and here there was no such expense.

Baker Hughes also highlights an IRS Technical Advice Memorandum ("TAM"), which Baker Hughes argues supports its position that the FFA should be a deductible business expense under Section 162. The district court

found that the TAM was distinguishable because the taxpayer there made payments to a subsidiary to end its business operations and not to facilitate its continued operations. In contrast, submitting the FFA to BJ Russia satisfied Russian regulations and allowed the continuation of business operations. *See* I.R.S. TAM 9522003, 1995 WL 327461 (June 2, 1995). Baker Hughes disputes this distinction, claiming that the payment from BJ Parent to BJ Russia was solely for the purpose of winding up BJ Russia's business operations, much like the taxpayer's payments to its subsidiary in the TAM.

We preface our analysis by saying the TAM is not precedential. *See* 26 U.S.C. § 6110(k)(3); *Bombardier Aerospace Corp. v. United States*, 831 F.3d 268 (5th Cir. 2016). The TAM is also distinguishable on the basis that the IRS recognized that a taxpayer generally may not claim a Section 162 deduction for payments of the obligation of some other taxpayer, but the TAM mentioned and did not reject the *Lohrke* exception. Under the facts as described in the TAM, the taxpayer made payments to the subsidiary so that the subsidiary could fully satisfy claims of depositors and creditors; this was legally required for its dissolution. TAM at 6. This is consistent with cases involving the *Lohrke* exception, which still involve an underlying expense to support a business expense deduction under Section 162. Indeed, the IRS stated that the exception "permits taxpayers to claim a deduction for a payment made to extinguish another taxpayer's liability where the payment was . . . an ordinary and necessary business expense." TAM at 9.

The IRS was correct to disallow any deduction based on the FFA.

AFFIRMED.