COULTER ELECTRONICS, INC. AND CONSOLIDATED SUBSIDIARIES and COULTER CORPORATION AND CONSOLIDATED SUBSIDIARIES, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; COULTER CORPORATION AND CONSOLIDATED SUBSIDIARIES and COULTER ELECTRONICS, INC., As Transferee of the Assets of Coulter Reagents, Inc., Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Coulter Electronics, Inc. v. Commissioner
Docket Nos. 1145-84, 18120-84
United States Tax Court
T.C. Memo 1990-186; 1990 Tax Ct. Memo LEXIS 205; 59 T.C.M. (CCH) 350; T.C.M. (RIA) 90186; April 10, 1990
Gregg D. Lemein, Robert H. Aland, and Michael T. McCormick, for the petitioners. Thomas R. Ascher, for the respondent. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: In two notices of deficiency both dated October 19, 1983, respondent determined deficiencies in the Federal income taxes of Coulter Electronics, Inc. *206 , and Subsidiaries as follows: Year Ended
Deficiency
3/31/72
$   506,299
3/31/73
2,284,848
3/31/74
979,371
3/31/75
1,759,563
In a third notice of deficiency, also dated October 19, 1983, respondent determined a deficiency of $ 163,279 in the Federal income tax of Coulter Corporation (formerly known as Coulter Electronics, Inc.) and Subsidiaries for the year ended March 31, 1976. On January 16, 1984, Coulter Electronics and Subsidiaries and Coulter Corporation and Subsidiaries filed a joint petition from the three notices of deficiency dated October 19, 1983. Their joint petition was assigned docket No. 1145-84. In a notice of deficiency dated March 12, 1984, respondent determined deficiencies in the Federal income taxes of Coulter Corporation and Subsidiaries as follows: Year Ended
Deficiency
3/31/77
$ 3,168,063
3/31/78
1,532,071
In a second notice of deficiency dated March 12, 1984, respondent determined that Coulter Electronics, Inc., was liable as a transferee of Coulter Reagents, Inc., for Federal income tax in the amount of $ 179,645 for the year ended March 31, 1978. On June 11, 1984, Coulter Corporation and Subsidiaries *207 and Coulter Electronics, Inc., as transferee of Coulter Reagents, Inc., filed a joint petition from both notices of deficiency dated March 12, 1984. This joint petition was assigned docket No. 18120-84. On March 25, 1985, the proceedings at docket No. 1145-84 and docket No. 18120-84 were consolidated for purposes of trial, briefing, and opinion. Since that date the parties have filed four Agreements of Settlement in which they have disposed of a number of issues leaving for decision only the following: (1) whether the assignment during fiscal years 1974 through 1978 by petitioners of certain equipment leases to a bank constituted sales as determined by respondent or pledges for loans as contended by petitioners; and (2) whether petitioners' reimbursements during fiscal years 1974, 1977, and 1978 to a Canadian subsidiary for certain warranty expenses are deductible by petitioners as ordinary and necessary business expenses under section 162. [1] Respondent also disallowed the deduction by petitioners of the disputed warranty expenses by allocating the expenses to the Canadian subsidiary under section 482; but on brief respondent abandoned this determination. *208 FINDINGS OF FACT Numerous facts have been stipulated and are found accordingly. The parties' Stipulation of Facts and their four Supplemental Stipulations of Facts together with the exhibits identified therein are incorporated herein by reference. Petitioner Coulter Electronics, Inc., is an Illinois corporation which had its principal office and place of business in Hialeah, Florida during 1972 through 1978 and at the time it filed its petition herein. Petitioner Coulter Corporation is a Delaware corporation which was organized in 1975 and acquired in January of 1976 all of the stock of Coulter Electronics in exchange for Coulter Corporation stock. Its principal office and place of business was also in Hialeah at the time its petition was filed and at all other relevant times. Coulter Electronics,Coulter Corporation, and all of their consolidated subsidiaries' which the parties have stipulated may for the purposes of these proceedings be referred to collectively as petitioner, maintained their accounting records and filed their income tax returns for all relevant periods using the accrual method of accounting and a fiscal year ending on March 31. During the fiscal years *209 ending on March 31, 1972, through March 31, 1978, petitioner manufactured diagnostic instruments and sold or leased them to hospitals, clinical laboratories, and physicians. Petitioner also manufactured and sold chemical reagents and controls for use with its instruments. In addition petitioner repaired and maintained its instruments pursuant to warranties and service contracts entered into with its purchasers and lessees. General Background. Petitioner's business was originally founded in 1958 by Wallace H. Coulter to manufacture and sell instruments which automatically count blood cells. The instruments, known as Coulter Counters, operate on the principle of volumetric impedance, which was invented and patented by Mr. Coulter. To count blood cells with this principle, a sample of blood is diluted in a salt solution and placed in a glass tube which has an aperture so small that when the diluted blood sample is drawn through the aperture by pressure, the blood cells pass through one by one. When the tube containing the blood sample is placed between two electrodes an electrical field is created; and as each blood cell passes through the aperture, it disrupts the electrical *210 field created by the electrodes. By counting the disruptions with a computer, the number of cells in the diluted blood sample can be determined. By measuring the size of the electrical pulse created by each disruption the size of each blood cell can be determined. Through the use of a chemical called a lysing reagent which was developed by petitioner, the red blood cells and the white blood cells in the blood sample can be counted and measured separately. The development of the Coulter Principle represented a revolutionary advance in blood diagnostic technology because before its introduction, blood cells could only be counted painstakingly and inaccurately by hand under a microscope. In contrast, Coulter Counter Model A, the first Coulter Counter introduced in 1958, could accurately count and size as many as 50,000 blood cells in 13 seconds. During the years under consideration, petitioner's principal product was the Coulter Counter Model S, the list price of which was about $ 50,000. The Model S accounted for approximately 80 to 85 percent of petitioner's production of instruments. The Model S improved upon the design of the Model A by automating the entire testing process. *211 With the Model A, the operating technician had to dilute the blood sample manually before introducing it into the instrument. The sample was then run through the instrument once to count the red blood cells and a second time to count the white blood cells. By contrast, with the Model S, the operating technician only had to place the undiluted blood sample in the instrument. The entire process of diluting, mixing, and analyzing the sample was performed automatically inside the Model S in 20 seconds. In addition to counting and measuring red and white blood cells, the Model S analyzed five other characteristics of the sample, which were hemoglobin, hematocrit, mean cell volume, mean cell hemoglobin, and mean cell hemoglobin concentration. Petitioner also manufactured other instruments based on the Coulter Principle and designed for differing applications in the medical and industrial fields. These instruments included a wide range of accessory equipment, such as printers to record test results, timers, sample diluters and mixers, and specialized centrifuges. Petitioner also manufactured and sold chemicals and controls for use with its instruments. The chemicals consisted primarily *212 of reagents. The controls were specially prepared samples of human blood with precisely known characteristics, such as red and white cell counts and hemoglobin content. They were used by petitioner's customers to test the calibration of their Coulter Counters, i.e., if a control did not generate the proper test results, the customer knew that its instrument was malfunctioning and had to be adjusted, repaired, or replaced. Petitioner also provided its customers with repair and maintenance services as required by its instrument warranties and service contracts. To provide these services petitioner employed several hundred trained service representatives at service centers throughout the United States and Canada. The representatives performed periodic inspections of petitioner's instruments to provide preventive maintenance, replace worn or defective parts, and diagnose and correct malfunctions. Petitioner guaranteed its customers emergency repair service 24 hours a day, seven days a week, anywhere in the United States or Canada within 24 hours of request. Petitioner's customers, which consisted to a large extent of hospitals and laboratories, were dependent on the preventive *213 maintenance and emergency services which petitioner provided. These customers could not afford to have their Coulter Counters inoperable. The instruments had to be in operation 24 hours a day. Petitioner's instruments, however, were so technologically advanced that customers were unable to maintain or repair them. If instruments failed and were not repaired quickly, the customers were forced to employ less accurate and more time consuming and more expensive manual testing procedures. Having grown accustomed to the speed and accuracy which petitioner's instruments provided, the customers were unwilling and often unable to perform manual testing. Under these circumstances, approximately 95 percent of petitioner's customers purchased service contracts with their instruments. Sale or Pledge of Leases. Prior to 1972 petitioner's business was limited to manufacturing and selling instruments but in 1972 petitioner established a leasing program. In this program petitioner used a standard equipment lease containing a description of the leased equipment, the rental term, and the amount of the monthly payment. The lease also obligated the customer to insure the equipment and *214 to name petitioner as an additional insured and loss payee. The leases generally covered a term of three to five years and the total of the rental payments was approximately equal to the selling price of the leased equipment plus interest for the term of the lease. The leasing program was adopted by petitioner in the belief that it would increase sales by providing customers with a means of financing the purchase of petitioner's instruments. With the program petitioner also had an opportunity to increase sales by including in the leases reagent and supply riders and service contracts. A reagent and supply rider required the lessee to purchase a certain quantity of reagents, controls, and other supplies from petitioner at a specified price during the lease. Under a service contract, the lessee was required to pay a specified monthly fee for repairs and maintenance on the leased equipment during the term of the lease. About 65 to 70 percent of petitioner's lease customers entered into such all-inclusive leases because they enabled the customer to know in advance the total cost of leasing and maintaining the equipment for the term of the lease. With the use of all-inclusive leases *215 petitioner's leasing program not only increased sales of reagents, controls, and services, but the program also increased petitioner's total sales of equipment through upgrade sales of new Coulter equipment to existing customers. In turn, the upgrade sales not only increased petitioner's sale of new models of equipment but also contributed to petitioner's sales and leases of used models. Before the end of 1972, petitioner realized that it did not have sufficient funds to maintain its leasing program and turned for help in this respect to Continental Illinois National Bank and Trust Company of Chicago (Continental). Consequently, on December 7, 1972, petitioner's board of directors unanimously adopted a resolution which reads in pertinent part as follows: 1. BE IT RESOLVED that any one of the following: the President, any Vice President, and Treasurer, of this Corporation be and he hereby is authorized, to execute for and on behalf of this Corporation, and to deliver, undertakings and agreements whereby this Corporation agrees to sell, and Continental Illinois National Bank and Trust Company of Chicago (herein called Bank) agrees to purchase, from time to time, conditional sale *216 contracts, leases, and chattel mortgages between this Corporation and its customers for such prices and upon such terms and conditions as the Bank may require and as the person signing such agreement on behalf of this Corporation shall deem necessary and appropriate and for the best interests of the Corporation, and the signature of said person shall be conclusive evidence of his determination of the propriety and necessity therefor. 2. FURTHER RESOLVED that any one of the aforesaid persons also be and he hereby is, authorized, on such terms and conditions as may be provided for in any such undertaking or agreement, to execute and endorse (either in blank or specially or with or without recourse) for and on behalf of this Corporation, and to deliver to said Bank in connection with any such sale, any and all notes, repurchase agreements, assignments of conditional sale contracts, assignment of leases, assignments of chattel mortgages, endorsements, guaranties or other instruments. Pursuant to the above resolution petitioner entered into an agreement with Continental. The agreement is in the form of a letter dated November 6, 1972, from Continental to petitioner; and even though *217 the agreement was not executed by both parties until December 7, 1972, it was frequently referred to thereafter by them as the "agreement of November 6, 1972." We will do the same hereinafter. In pertinent part the agreement reads as follows: We [Continental] understand that you [petitioner] are engaged in the manufacture and subsequent rental and sale of medical equipment and related products to hospitals, medical laboratories and other enterprises for use in such enterprises rather than for resale and that you may from time to time offer to us for purchase leases and installment sales contracts arising out of such business. This letter sets forth the price we will pay for, and the terms and conditions which will be applicable to, any installment sale contracts or leases that we may purchase from you. 1. The following terms, wherever used in this Agreement, shall have the meanings ascribed to them in this paragraph: * * * f. "Contract" means: Either or both of the following if evidenced by a document in form satisfactory to us and providing for periodic payments over not more than 84 months: (i) a non-cancellable lease, in which the lessee agrees to waive all defenses *218 against assignee arising out of a rental of Equipment * * * or (ii) an installment sales contract arising out of a sale of Equipment. g. "Payment" means: Any payment receivable by the vendor or lessor on account of a Contract. h. "Balance of Payment" means: The total Payments due and to become due under the relevant Contract at such date. i. "Obligor" means: Any party obligated in respect of the Contract other than the lessor or vendor. j. "Reserve Account" means: An account at our Bank in your name but under our sole control into which is paid, at the time of purchase of a Contract, the portion of the Balance of Payment attributable to the amount included in the relevant Contract for taxes, Cancellable Rents and Undelivered Reagents. The ratio of this amount to the Balance of Payment as at the date of purchase shall be equal to the ratio as at the date of the Contract of the total amount specifically attributable to taxes, Cancellable Rents and Undelivered Reagents to the Balance of Payments. k. "Discount" means: The difference between the Balance of Payment and the purchase price to us. l. "Unearned Discount" at any time means: The amount determined at such time *219 by applying the Sum of the Digits Rule (Rule of 12/78th) to the amount of Discount at which the Contract was purchased by us as of the date it is repurchased by you. m. "Balance to Purchase" at any time means: The Balance of Payment minus the Unearned Discount at such time. n. "Default" means: (1) non-payment when due, of any Payment; (2) failure of any Obligor to perform any of its obligations under the Contract; (3) falsity in any material respect as of the date made in any statement, representation, or warranty of any Obligor in connection with any Contracts; (4) any Obligor becomes insolvent or unable to pay debts as they mature or makes an assignment for the benefit of creditors, or any proceeding is instituted by or against any Obligor alleging that it is insolvent or unable to pay debts as they mature; (5) entry of any final judgment against any Obligor remaining unsatisfied for a period of thirty (30) days; (6) death of any Obligor who is a natural person, or of any partner of any Obligor which is a partnership if such deceased partner is deemed a material factor in the partnership enterprise; (7) dissolution, merger, or consolidation, or transfer of a substantial part *220 of the property of any Obligor which is a corporation or a partnership; or (8) we have a reasonable basis for belief that any Obligor will fail to perform one or more of its material obligations under the particular Contract. 2. The purchase price of a Contract shall be computed as of the date of purchase by discounting at the then applicable discount rate set forth in Schedule A attached hereto (as the same may from time to time be revised by written revisions agreed to between us) the Balance of Payment minus any amount included therein for taxes, service contract payments, Cancellable Rentals and Undelivered Reagents. To this amount shall be added the amount of the Balance of Payment allocated for taxes, Cancellable Rentals, service contract payments and Undelivered Reagents. 3. We shall first apply the purchase price against any payments you are then required to make to us under the terms of this Agreement; next we shall credit the Reserve Account as explained above; and then we shall pay any remainder to you in cash. * * * 5. At the time of our purchase of each Contract you will assign the Contract to us by executing that form of Seller's or Lessor's Assignment appearing *221 on the reverse side of the Contract which we shall mutually agree upon or by executing such other form of assignment as we shall require. (Any such assignment you execute is herein called the "Assignment"). You shall also grant or assign to us such security interest in the underlying Equipment as we shall request. We shall not be deemed by reason of such assignment or security interest, to have assumed any of your obligations under the Contract. 6. Upon your request, but not more often than once each month, you will advise us of the amount then credited to the Reserve Account that is earned as Cancellable Rentals become firm rentals or taxes are collected and become due or service contract payments are received or Undelivered Reagents are delivered. We will first apply such amount against any payments you are then required to make to us under the terms of this Agreement and then we will pay any remainder to you in cash. 7. You hereby warrant (and such warranty shall be considered as having been made concurrently with any sale of any Contract to us as an inducement to us to make such purchase) that: * * * e. With respect to any Contract that is offered to us pursuant *222 to the terms of this Agreement the following shall be true at the time that the Contract is offered * * * : (i) The Contract arises from a bona fide lease or sale of the Equipment described therein and such Equipment is in all respects in accord with the requirements of the Contract and has been delivered to and accepted by the lessee or vendee; (ii) The Contract is genuine, valid, enforceable in accordance with its terms and in all respects what it purports to be; you have good title to the Contract, and, subject to the interest of lessee or the vendee, in the Equipment covered thereby; good title to the Contract and a valid security interest in your rights in the Equipment, superior to the rights of all others will be vested in us by the Assignment; and the Contract is one which we are and will continue to be authorized by law to purchase and hold; (iii) All counterparts of the Contract have been clearly marked to indicate that only one thereof is the "Original" and assignable and such counterpart shall be the counterpart delivered to us; * * * 8. Until the termination of this Agreement and for so long as we hold any Contract purchased under this Agreement as to which *223 there exists any Balance of Payment, you agree that you shall: a. Furnish to us (i) within one hundred twenty days after each fiscal year, a copy of your most recent audited financial statement, prepared by an independent firm of certified public accountants satisfactory to us, in conformity with generally accepted accounting principles applied on a basis consistent with that of the preceding fiscal year and presenting fairly your financial condition as at such date, and the results of your operations for the twelve-month period then ended, and stating that since such date there has been no material adverse change in your financial condition, (ii) within forty-five (45) days after each fiscal quarter of each fiscal year, a copy of your unaudited financial statement, similarly prepared, consisting of at least a balance sheet as at the close of such quarter and a profit and loss statement and analysis of surplus for such quarter and for the period from the beginning of such fiscal year to the close of such quarter, and signed by your principal partner or chief executive officer, and (iii) from time to time, such other information as we may reasonably request. b. Permit reasonable *224 access by us to your books and records. c. Maintain or cause to be maintained insurance to such extent and against such hazards and liabilities as is commonly maintained by companies similarly situated. d. Pay or cause to be paid when due all taxes, assessments, and other liabilities (including all taxes and other claims in respect to the Contracts and the Equipment covered thereunder), except and so long as contested in good faith. e. Perform all your obligations arising by contract or imposed by applicable law with respect to Contracts or the Equipment covered thereby, including without limitation, maintenance and service of all such Equipment in accordance with your standard practice and policy. f. Take or cause to be taken all steps necessary to perfect a security interest in the Equipment and to perfect the assignment of such security interest to us by causing such financing statements and other documents to be filed or recorded in such public offices as may be necessary or advisable to perfect and protect our interest. 9. In the event of breach of any of your warranties or covenants with respect to any specific Contract owned by us, you agree to repurchase for *225 cash such Contract, upon demand by us for a price equal to the Balance to Purchase. In the event of breach of any other warranty or covenant you agree to repurchase for cash, upon demand by us, all Contracts for a price equal to the Balance to Purchase. We will reassign to you any such repurchased Contract and the security interest in the underlying Equipment without recourse and without warranties of any kind. 10. In the event that we shall give written notice to you of any default under any Contract which shall not have been cured within sixty (60) days after it shall have occurred and shall simultaneously request you to repurchase such defaulted Contract, you shall within fifteen (15) days after receipt of such notice, pay to us an amount equal to the Balance to Purchase, computed as of the time of such payment and we will then reassign to you any such repurchased Contract and the security interest in the underlying Equipment without recourse and without warranties of any kind. 11. If you should become involved in any bankruptcy, reorganization or debt adjustment proceeding, voluntarily or involuntarily, or if you should make an assignment for the benefit of creditors, or *226 if any income tax lien shall be filed against you, or any of your property, or if you shall fail to repurchase from us any Contract which under the terms of this Agreement or under the terms of any Assignment you are obligated to repurchase, or if you should fail to make good on any guaranty given to us in connection with any Contract, or if you shall cease to engage in substantially the same business in which you are presently engaged, then and in any of such events you agree, promptly upon receiving a written demand from us so to do, to repurchase all of the Contracts then owned by us for a repurchase price in cash equal to the Balance to Purchase of the Contracts, and upon your failure so to do, we may, at our option, appropriate and apply against your said obligation any amounts then standing to the credit of the Reserve Account. * * * 14. You hereby waive notice of any default by any Obligor under any Contract purchased by us, and you consent that we may, without affecting any of your liabilities or obligations hereunder or under any Assignment, agree with any Obligor as to any modification of, or as to any extension of, time of payment or other indulgence. * * * The *227 terms and conditions of this Agreement shall supersede all terms and conditions set forth in any previous agreements between us pertaining to Contracts similar to those above described and shall apply to all Contracts heretofore or hereafter purchased from you. * * * Schedule A The discount rate will yield to the Bank the sum of its prime rate (in effect on the date the Contract is purchased), plus 2.5% per annum on the purchase price for the term of Contract. For purposes hereof, Bank's prime rate shall mean the rate charged by Continental Illinois National Bank and Trust Company of Chicago for unsecured 90-day loans at Chicago, Illinois to corporate commercial borrowers of the highest credit standing. By a letter agreement dated November 15, 1973, Continental and petitioner amended the agreement of November 6, 1972, as follows: Reference is made to the Letter Agreement between your company and our bank dated November 6, 1972 (hereinafter the "Letter Agreement"). In order to amend the Letter Agreement to limit our recourse to you in the event of a default under any Contract purchased by us, you and we hereby agree as follows, it being understood that all capitalized terms *228 used in this letter amendment but not defined herein shall have the meanings given to such terms in the Letter Agreement. Paragraph 10 of the Letter Agreement is hereby replaced by Paragraphs 10 a, b, c, d, e below: 10 a. In the event that we shall give written notice to you of a Default in regard to a Contract, which Default has not been cured within thirty (30) [changed by hand to "60" in original] days, and shall request you in writing to repurchase such Contract, you shall within ten (10) [changed by hand to "15" in original] days after receipt of such request, pay to us an amount equal to the Balance to Purchase (as defined in the Letter Agreement) of such Contract computed as of the time of such payment, and we will then reassign to you any repurchased Contract and the security interest in the underlying equipment, without recourse and without warranties of any kind. "Loss" on a Contract shall mean the Balance to Purchase of such Contract plus all your reasonable and necessary out-of-pocket costs and expenses, including reasonable attorneys' fees, in effecting recapture or repossession of the equipment described in such Contract, in transportation, storage, reconditioning, *229 reselling, or re-leasing said equipment and in effecting any recovery of any deficiency owing by any Obligor and including any taxes or similar fees paid or incurred by either of us from the date of such Default to the date of resale or re-lease of such equipment and less any payments made to you by or on behalf of the lessee or vendee subsequent to the repurchase or re-lease of such Contract. Upon your repurchasing a Contract from us pursuant to this paragraph 10 a., you agree promptly to take all reasonable steps to recapture possession of the equipment covered by such Contract and to use your best efforts to resell or re-lease such equipment promptly thereafter before attempting to resell or release any similar equipment covered under Contracts repurchased from us under paragraph 9 of the Letter Agreement. b. For the purpose of determining the maximum amount of Loss with respect to Contracts which shall be borne by you, Contracts shall be divided into groups so that all Contracts purchased by us during a particular 12-month period (the first such period commencing January 1, 1973) and a new period commencing on each anniversary date thereafter) shall be a separate group (hereinafter *230 called a "Group"). The maximum amount of Loss which you shall be required to bear hereafter on account of repurchases under the foregoing paragraph 10 a. with respect to a particular Group of Contracts (regardless of whether such Loss is realized during the 12-month period in which such Contracts were purchased by us or in some subsequent 12-month period) shall be equal to 50% of the aggregate unpaid balance of all such Contracts in such Group. In making the foregoing computations, the unpaid balance of a Contract shall be computed as of the initial date of our purchase thereof from you. c. In the event that the performance of your obligations to repurchase Contracts under paragraph 2 above causes your Losses to exceed the maximum amount of Loss computed in accordance with paragraph 10 b. above, we shall, within 10 days after receipt of your invoice for the amount of excess Loss, refund such amount to you. d. The limitations of Losses which you shall be required to bear under the above paragraphs 10 a. and 10 b. pertain solely to Losses occasioned by reason of your obligations to repurchase Contracts due to a Default thereunder. Losses incurred by you by reason of your obligations *231 to repurchase Contracts because of matters other than those provided in the above paragraph 10 a. shall not be considered in determining whether the amount of Loss you have borne or will bear is more or less than the applicable maximum amount of Loss computed under the above paragraph 10 b. e. Except as otherwise provided by the provisions of this Letter Amendment, the purchase and repurchase of Contracts shall be governed by the terms of the Letter Agreement. Petitioner and Continental from time to time further amended the agreement of November 1972 in order to adjust the discount rate to be charged by Continental to reflect changes in the prevailing interest rates. In their original agreement the discount was fixed at Continental's prime plus 2.5 percent. In November of 1973 the discount rate was changed to the lesser of 11 percent or Continental's prime plus 2.5 percent. In December of 1974 the rate was changed to 14 percent and in March of 1978 it was changed to 10.75 percent for equipment selling for less than $ 25,000 and 10.25 percent for equipment selling for more than $ 25,000. As pointed out hereinafter, the letter agreement was also amended in 1977 and in 1978 to *232 limit petitioner's recourse liability to $ 10 million for each annual group of leases assigned to Continental during those years. In a letter dated June 1, 1973, Continental instructed petitioner's comptroller that to comply with the agreement of November 1972, petitioner should proceed as follows: In changing to the arrangement provided for under our Agreement dated November 6, 1972, the following procedures are appropriate and will help make the program easy to handle by all concerned. Under this arrangement, you should send to us the following package for discount: (1) Sell sheet completely filled in. Be certain to show the number of payments remaining, total balance on the contract, and the due date on which the next installment is due. (2) Lease with completed lease assignment. (3) Credit information. (4) Your copy of the UCC filing. Upon receipt of the package, we will do the following: (1) Discount the transaction and credit your account for the proceeds. (2) Mail coupon book directly to lessee or purchaser. (3) Mail first (after 7 days of delinquency) notice to borrower-lessee and second notice (15 days delinquent) directly to borrower. A copy of the *233 second notice will be sent to your office so that collection follow-up will be initiated. (4) Twice weekly you will receive complete listings of all outstanding accounts so that your records will be up to date. (5) Delinquency lists will be mailed promptly on the 15th and 30th of each month. (6) At the end of each month you will receive a complete run of all outstanding accounts. In order to comply with Continental's instructions, petitioner required each of its customers seeking to lease equipment to submit a lease application. From this application petitioner compiled a data sheet which included the customer's name, description of equipment, duration of the lease, and the number and amount of payments. From this information and a credit investigation petitioner made a determination as to the applicant's creditworthiness and financial strength. If the applicant's credit was approved, petitioner executed the lease and an assignment form, and forwarded them together with the data sheet to Continental. Any lease entered into by petitioner with a customer having questionable credit or lacking in an acceptable credit history was retained by petitioner. Upon receipt from petitioner *234 of an equipment lease, data sheet, and assignment form, Continental computed the amount due petitioner under the agreement of November 1972, credited that amount to petitioner's account, and forwarded a coupon book reflecting the rental payments due under the equipment lease to the lessee with instructions to the lessee to use the coupon book for making rental payments directly to Continental. Continental never exercised its right under paragraph 14 of the 1972 letter agreement to modify the time for payment under the leases. Continental annually established an internal credit line as a limit on the amount of leases which petitioner could transfer under the agreement. The method by which Continental established its credit lines for petitioner's leasing program was identical to the method by which it established credit lines for secured loans. For financial accounting purposes, Continental treated the payments it received under leases transferred under the agreement as principal and interest payments on loans. Its accounting treatment for petitioner's leases was identical to its treatment of secured loans. Continental made the following accounting entries when it acquired a lease *235 from petitioner: Dr. Loans and discounts (face amount of lease contract including service and reagent riders) Cr. Cash (amount advanced to petitioner) Cr. Unearned income (interest to be earned over lease term) Cr. Reserve account (face amount of service and reagent riders) When a lessee did not make rental payments to Continental when due, Continental mailed two delinquency notices to the lessee. The first notice was mailed seven days after delinquency and the second notice fifteen days after delinquency. A copy of the second notice was sent to petitioner. Continental also sent a list of delinquent leases to petitioner on the fifteenth and thirtieth of each month. Upon receipt of notice that a lease was delinquent, petitioner caused one of its employees to telephone the customer to ascertain the reason the payments were late. If the telephone contact did not correct the delinquency, petitioner's leasing specialist responsible for the account was required to visit the customer. If these efforts were not successful, petitioner reacquired the lease from Continental by paying the discounted current value of the remaining rental payments. Where petitioner could not correct *236 a defaulted lease, the leased equipment was repossessed and remarketed by petitioner after performing any necessary repairs or reconditioning. Continental had no direct contact with lessees in default. Its role in the collection of past due accounts was limited to the two delinquency notices mailed to delinquent lessees. Petitioner did not want Continental to interfere with its relationships with its customers or to play any role in the repossession, reconditioning, or resale of equipment under defaulted leases. The limitation on Continental's activities with respect to defaults by lessees was not found in Continental's dealings with other clients in situations similar to petitioner's. However, during the negotiations leading to the agreement of November 1972 petitioner's vice-president for sales and marketing had insisted upon the limitation and Continental had agreed to modify its usual agreement so as to limit Continental's involvement with petitioner's customers. In instances with other clients involving the purchase by Continental of equipment leases and conditional sales contracts, Continental had more direct involvement with the client's customers including the responsibility *237 for collection expenses on defaults and in some instances including repossessions. Under the agreement of November 1972, petitioner and not Continental bore all expenses of collecting past due amounts from delinquent lessees. Petitioner was also responsible for all expenses of repossessing, moving, reconditioning, and remarketing the equipment covered by defaulted leases. Under paragraph 8 of the agreement of November 1972, petitioner was required to, and did, furnish Continental with copies of its audited annual and unaudited quarterly financial statements. Pursuant to the agreement the annual and quarterly statements were prepared by an independent firm of certified public accountants acceptable to Continental. Under the same paragraph, petitioner was required (1) to permit Continental reasonable access to petitioner's books and records; (2) to maintain insurance in such amounts and against such hazards as other companies similarly situated; (3) to pay all taxes with respect to the leases assigned to Continental and the equipment covered thereby; and (4) to perform all obligations imposed on the lessor by the terms of the leases or by any applicable law. Under paragraph 11 *238 of the agreement, petitioner was obligated to reacquire from Continental any and all outstanding leases if petitioner (1) became involved in any proceeding under the Bankruptcy Act; (2) made an assignment for the benefit of creditors; (3) permitted any income tax lien to be filed against it; or (4) ceased to be engaged in the leasing business. Continental's responsible officers did not feel that Continental had any risk of loss under the agreement of November 1972 with respect to the leases assigned to Continental by petitioner, or with respect to the funds advanced to petitioner with respect thereto, as long as petitioner remained solvent and capable of reacquiring defaulted leases. In other words, in its acquisition of the leases Continental primarily relied on the creditworthiness of petitioner and not on the creditworthiness of petitioner's customers. Continental considered the leases as collateral for petitioner's primary responsibility. The discounts earned by Continental on the leases assigned by petitioner during the years 1972 through 1978 was approximately equal to the interest earned by Continental on secured loans made to other customers during the same periods. Under *239 the original agreement of November 1972 there was no limit on petitioner's responsibility to reacquire from Continental leases upon which defaults occurred. However, in the letter agreement dated November 15, 1973, the agreement of November 1972 was amended in order to provide that thereafter leases transferred to Continental by petitioner during any particular year constituted a separate group and petitioner's loss with respect to defaulted leases in any annual group was limited to 50 percent of the unpaid balance of the leases in the group computed as of the date the leases were transferred to Continental. By letter dated March 22, 1977, Continental agreed to limit petitioner's loss with respect to the reacquisition of defaulted leases to $ 10 million for leases in existence on March 31, 1977. By letter dated March 27, 1978, Continental agreed to extend the $ 10 million limitation to leases in existence on March 31, 1978. Since the leases assigned to Continental as a general rule had terms of three to five years and an average term of less than two and one half years, neither petitioner nor Continental felt that the limitations placed on petitioner's maximum liability by the *240 letter agreement of November 15, 1973, and the letters of March 22, 1977, and March 28, 1978, represented significant changes in petitioner's responsibility or Continental's risk of loss with respect to the assigned leases. For financial reporting purposes, and on its income tax returns for fiscal years 1974 through 1978, petitioner reported its equipment leases as sales of the equipment to its customers by recording the normal selling price of the equipment as net sales and the manufacturing cost of the equipment as cost of goods sold. The excess of the total rental payments due under a lease over the normal selling price of the leased equipment was recorded by petitioner as deferred interest income which was amortized over the term of the lease. The transfer of a lease to Continental was also recorded by petitioner as a sale with the excess of any proceeds from Continental over the normal selling price of the equipment being recorded as interest income thereby eliminating any remaining deferred interest income with respect to the transferred lease. During the early part of respondent's audits which ultimately led to these cases, petitioner took the position that its leases of *241 equipment during 1974 through 1978 had been incorrectly recorded on its books and reported on its income tax returns as sales rather than as leases of the underlying equipment. During the latter part of such audits and in his notices of deficiency, respondent conceded that petitioner's equipment leases did constitute leases and not sales for Federal income tax purposes but determined that the transfers of the leases to Continental constituted sales of the leases from which petitioner realized ordinary income. The assignment form initially used by petitioner to transfer the equipment leases to Continental reads in pertinent part as follows: FOR VALUE RECEIVED, Lessor hereby sells, assigns and transfers to Continental Illinois National Bank and Trust Company of Chicago, 231 LaSalle Street, Chicago, Illinois, all of its right, title and interest in and to (i) the rents and other sums payable under the attached lease dated 197 between Coulter Electronics, Inc and (Lessee) (ii) the Equipment covered thereby; and (iii) all other rights to the Lessor under said Lease. In June of 1977 the assignment form was revised to read as follows: FOR VALUE RECEIVED and pursuant to a letter agreement *242 dated November 6, 1972, between the undersigned and Continental Illinois National Bank and Trust Company, (herein called the "Agreement"), the undersigned hereby sells, assigns and transfers to the Bank, as assignee, all right, title and interest of the undersigned in and to (i) the rents and other sums payable under the attached contract dated , 19 , between Coulter Electronics, Inc. (Coulter) and (Lessee), and (ii) all other rights of the Lessor under said contract. Coulter hereby grants to the Bank a security interest to all of Coulter's right, title and interest in the Equipment referred to in the attached contract. The terms and conditions of this sale, assignment and transfer, including, but not limited to, the undersigned's warranties with respect to Contracts as defined in the Agreement and the undersigned's obligations to repurchase such Contracts from the Bank, are as provided for in the Agreement, to which reference is hereby made for a statement thereof. During the fiscal years 1974 through 1978, petitioner assigned equipment leases to Continental having initial unpaid balances as follows: 1974
$ 13,832,789
1975
11,891,020
1976
12,421,438
1977
15,207,454
1978
11,332,421
*243 For the leases assigned to Continental during such years, petitioner received after discounts the following amounts from Continental: Year
Amount
1974
$ 10,441,190
1975
8,492,736
1976
9,224,322
1977
11,867,729
1978
9,091,452
As of the end of each of the fiscal years 1974 through 1978 the total contingent liability of petitioner on leases theretofore assigned to Continental, or the total "balance to purchase" as defined in paragraph 1m of the 1972 letter agreement, for outstanding leases assigned by petitioner to Continental was as follows: Balance to
Vintage year of leases
purchase at
1974
1975
1976
1977
1978
3/31/74
$ 9,944,479
n/a    n/a    n/a    n/a    3/31/75
8,256,931
$ 8,413,637
n/a    n/a    n/a    3/31/76
6,405,665
6,868,715
$ 9,082,081
n/a    n/a    3/31/77
4,522,766
5,258,828
7,386,342
$ 11,114,812
n/a    3/31/78
2,665,121
3,480,778
5,532,231
8,797,683
$ 8,513,324
During fiscal years 1974 through 1978, petitioner reacquired equipment leases from Continental at a total reacquisition cost to petitioner of $ 4,013,049.83. Reacquisitions *244 occurred upon the happening of any one of several different events including: (1) assignment of a lease by the lessee to another lessee; (2) cancellation of a lease; (3) loss of creditworthiness by a lessee; (4) default on the lease by a lessee; (5) exercise of a purchase option by a lessee; and (6) an upgrade in equipment by a lessee. At the time of trial petitioner was unable to determine the reason for the reacquisitions during 1974 through 1978 of some leases from Continental. With the reason for these reacquisitions being shown as unknown, the total amounts expended by petitioner for the various types of reacquisitions were as follows: 1974
1975
1976
1977
Assignment
$   - 0 -   $   - 0 -   $   - 0 -   $   - 0 - Cancellation
- 0 -   5,016.08
178,557.66
94,071.38
Credit-
worthiness
51,135.46
10,179.03
31,159.57
- 0 -   Default
219,305.69
162,616.31
290,611.42
405,599.64
Purchase
Option
- 0 -
- 0 -   35,660.66
189,323.96
Upgrade
- 0 -
49,048.38
96,914.44
228,315.01
Unknown
207,510.55
272,502.74
324,619.89
- 0 -   Total
$ 477,951.70
$ 499,362.54
$ 957,523.64
$ 917,309.99
*245 1978
Total
Assignment
$    39,856.72
$    39,856.72
Cancellation
228,412.21
506,057.33
Credit-
worthiness
-0-   92,474.06
Default
520,195.77
1,598,328.83
Purchase
Option
84,650.02
309,634.64
Upgrade
287,787.24
662,065.07
Unknown
-0-   804,633.18
Total
$ 1,160,901.96
$ 4,013,049.83
In practice a reacquisition was accomplished by petitioner notifying Continental of its intention to reacquire a certain lease and the payment by petitioner of the current discounted value of the remaining lease payments. As a general rule petitioner's notification was accompanied by a statement of the reason for the reacquisition but the reason stated by petitioner was never questioned or contested by Continental. The average annual percentage of leases reacquired by petitioner from Continental as a result of defaults by lessees during fiscal years 1974 through 1978 was 2.47 percent. Warranty Expenses. Coulter Electronics of Canada, Inc. (CEC), a Canadian corporation with principal offices in Ontario, is one of petitioner's wholly-owned subsidiaries. During 1974 through 1978, CEC was the marketer and distributor in Canada *246 of diagnostic instruments manufactured by petitioner. CEC also manufactured reagents and provided technical support and services to its customers in Canada. By 1978, CEC had approximately 22 employees engaged in selling instruments and reagents, 45 employees engaged in servicing instruments, and 10 employees engaged in manufacturing reagents and in distribution. During the years 1974 through 1978 petitioner's North American operations were divided into nine regions for management purposes. Canada was one of these regions and was treated by petitioner in the same manner as the other eight regions which were located in the United States. CEC's employees attended the same internal meetings and followed the same operating policies and guidelines as petitioner's employees in the United States. Managementwise, CEC performed the same functions as the regional organizations in the United States. Petitioner originally established CEC as a separate Canadian subsidiary rather than as a branch of the American operation primarily because petitioner considered it imperative that its Canadian operations have a local character. In other words, petitioner believed that it was advisable to *247 have Canadian customers view CEC as a Canadian rather than as an American enterprise. The Canadian and United States markets for petitioner's instruments were interrelated due to the common language and the proximity of the two countries. Physicians, hospital administrators, and other officers and employees of customers from both countries regularly attended the same trade shows and seminars, read the same trade journals, and had the same need for accuracy, speed, and reliability in their medical equipment. In fact, some of petitioner's customers operated on both sides of the border. Due to this interrelationship, petitioner viewed the United States and Canadian markets for its instruments as one market. Although the markets were interrelated, there were significant differences. The most significant difference was due to the low density of Canada's population. While the Canadian population is only about one-tenth of the United States population, it is dispersed over a geographical area which is about the same as that of the United States. Another significant difference is the fact that with Canada being a bilingual country, it is necessary to conduct business in Canada in *248 both French and English. In thousands of dollars CEC's operating results for 1974 through 1978 were as follows: 1974
1975
1976
1977
1978
Net sales
$ 4,187
$ 4,868
$ 5,991
$ 5,974
$ 4,761 Cost of
goods sold
2,544
3,123
4,064
4,102
3,265 Gross profit
$ 1,643
$ 1,745
$ 1,927
$ 1,872
$ 1,496 Operating
expenses
1,276
1,298
1,444
1,532
1,746 Earnings before taxes
$   367
$   447
$   483
$   340
($   250)
Income taxes
194
226
275
184
(58)
Net income
$   173
$   221
$   208
$   156
($   192)
During 1974 through 1978, CEC extended the same warranty services on petitioner's instruments to its Canadian customers as petitioner gave to its United States customers. The warranties usually covered a period of one year and consisted of periodic preventive maintenance and 24-hour emergency service for malfunctions. Petitioner reimbursed CEC for the expenses of providing warranty services in Canada on equipment manufactured by petitioner in the following amounts: Taxable Year
Amount
1974
$  97,839
1975
155,863
1976
202,823
1977
205,837
1978
205,856
Petitioner *249 believed that the quality of the warranty services provided by petitioner in the United States and by CEC in Canada had a direct effect on petitioner's sales of instruments because independent surveys consistently indicated that after-sale service support was the primary reason why customers chose petitioner's instruments over those manufactured by competing companies. The quality of warranty services also had a direct effect on the sale of petitioner's chemicals. Therefore, petitioner's officers concluded that if adequate warranty services were not provided by CEC to Canadian customers, the sale of petitioner's instruments and chemicals in Canada would be adversely affected. Petitioner's officers also believed that inadequate warranty services to Canadian customers could adversely affect the sale of petitioner's products in the United States due to the interrelation of the customers in the two countries. The failure to provide satisfactory service in Canada could have an adverse effect on petitioner's reputation in the United States for providing excellent after-sale services. The cost of providing warranty services for petitioner's instruments was substantially higher in Canada *250 than in the United States. This was because customers in Canada were dispersed over a greater geographical area, and in order to provide petitioner's emergency service of 24 hours a day, seven days a week, CEC had to maintain a service staff even in remote areas throughout Canada and regardless of the actual frequency of customer complaints. As a result, CEC's service engineers were able to operate at only 40 to 60 percent of capacity and because they had to cover such large geographical areas, each engineer had to be qualified to service the full range of petitioner's instruments. Consequently, they could not specialize in the repair of a particular instrument or group of instruments. In the absence of such specialization a CEC service engineer generally required approximately one year of in-house training before he could be effectively used in the field. By contrast, in the United States, where service engineers are generally located in densely populated areas, a service engineer can be trained in one month to specialize in servicing a narrow range of petitioner's instruments and once so trained can be kept fully occupied in that role. Petitioner's officers concluded that *251 CEC could not offset the additional cost of providing petitioner's usual warranty service by increasing its prices for petitioner's instruments due to the close proximity of the Canadian customers to the customers of petitioner located in the United States. In final analysis they concluded that reimbursing CEC for its warranty expenses was the only way petitioner could be assured that CEC would maintain the high level of warranty services that petitioner required. Furthermore, by specifically reimbursing CEC's warranty expenses, petitioner not only had the assurance that the warranty services were performed but also received valuable information on the field performance of its products. This was true because as a condition to reimbursement, petitioner required CEC to provide weekly service reports on the nature of instrument failures and the type of repairs needed. Petitioner used this information to improve the design and construction of its instruments. With regard to warranty services in the United States, from the late 1950's until early 1974, the Scientific Products Division ("SP") of American Hospital Supply Corporation, a publicly held company, served as the exclusive *252 distributor of petitioner's instruments in the United States. During this period, petitioner granted SP discounts (or commissions) on United States list prices of 20 percent on its Model S instruments and 17 to 35 percent on other instruments. In January of 1974, petitioner acquired all of the stock of SciMed International, Inc., a United States corporation, which in turn owned all of the stock of Curtin-Matheson Scientific, Inc. ("CMS"), another United States corporation. Petitioner and CMS then entered into a Distributorship Agreement which remained in effect through 1978 under which CMS received discounts (or commissions) of 10 to 15 percent on the Model S and 17 percent on other instruments. Petitioner performed and bore the cost of warranty services on its instruments sold in the United States by SP and CMS. Petitioner gave CEC a discount of 50 percent prior to 1974 and 35 percent thereafter on instruments manufactured by petitioner. The discounts petitioner granted to SP and CMS during these periods were lower because SP and CMS performed substantially fewer functions in connection with the sale of petitioner's instruments in the United States than CEC performed in Canada. *253 Unlike CEC, SP and CMS were not responsible for direct sales or demonstrations of petitioner's products, and SP and CMS did not provide any technical support or warranty services on such products. SP and CMS also did very little warehousing or physical distribution of petitioner's products. Petitioner felt that the cost of the additional functions which CEC performed in Canada with respect to petitioner's equipment over those performed by SP and CMS in the United States was approximately equal to the additional discount granted to CEC. During 1974 through 1978 petitioner's instruments were sold in a number of foreign countries including Japan, the United Kingdom, Brazil, and Venezuela. They were distributed in Japan by Japan Scientific Instrument Co., Ltd. ("JSI"), a Japanese corporation unrelated by ownership to petitioner. In actual practice, petitioner sold its instruments to American Commercial, Inc., a United States subsidiary of JSI, which resold them to JSI for distribution in Japan. JSI performed warranty services on petitioner's instruments sold in Japan and bore the expense of such services. With the exception of Japan, petitioner's instruments were distributed *254 in countries outside North America by locally organized subsidiaries of petitioner. Petitioner's subsidiaries outside North America bore the costs of the warranty services they performed on petitioner's instruments in their countries. JSI and petitioner's subsidiaries outside North America bore their own warranty expenses because they were able to earn higher profits than CEC could earn in Canada. Their profit margins were greater than those of CEC because they were able to charge higher prices for the instruments in their countries than CEC could charge in Canada because their markets were not subject to the price constraints imposed on CEC in Canada by the physical proximity of petitioner's market in the United States. Competition in the industry was generally less intense outside North America than in North America. In addition, petitioner's subsidiaries outside North America usually purchased their instruments from petitioner's manufacturing subsidiary in the United Kingdom at prices lower than the prices charged by petitioner to CEC, JSI's subsidiaries, and petitioner's subsidiaries outside North America. Finally, JSI and petitioner's subsidiaries outside North America *255 did not have the additional warranty costs faced by CEC in Canada because of the geographical nature of Canada. As a result, they could provide the same warranty services as CEC at a lower cost. Petitioner deducted the reimbursements of CEC's warranty expenses in its Federal income tax returns for 1974 through 1978; and when respondent disallowed the deductions, petitioner requested that the issue be considered by the Canadian Competent Authority under the income tax treaty between the United States and Canada. The Canadian Competent Authority allowed correlative deductions to CEC for the warranty expenses in 1975 and 1976 and petitioner thereupon agreed to respondent's adjustments for those year's. However, the Canadian Competent Authority was unable to allow correlative deductions to CEC for 1974 and 1977 because the Canadian statute of limitations had expired with respect to those years. Furthermore, even though the Canadian statute of limitations had not expired for 1978 the allowance of the correlative deduction for that year merely increased an operating loss which under Canadian law had to be carried back to 1977. Since a deduction in 1977 was time barred, CEC was unable *256 to obtain a Canadian tax benefit for a correlative deduction in 1978. OPINION Sale or Pledge of Leases. Respondent first contends that under Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971), the rule enunciated by the Court of Appeals for the Third Circuit in Commissioner v. Danielson, 378 F.2d 771 (3d Cir. 1967), cert. denied 389 U.S. 858 (1967), and adopted by the Court of Appeals for the Eleventh Circuit in Bradley v. United States, 730 F.2d 718, 720 (11th Cir. 1984), cert. denied 469 U.S. 882 (1984), prohibits any attempt by petitioner in this case to alter the terms of the agreement between petitioner and Continental. In other words, respondent argues, petitioner is bound by the terminology used in the agreement of November 1972 which characterizes the transfer of the leases as sales unless petitioner complies with the Danielson rule. The Danielson rule is that "a party can challenge the tax *257 consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc." This Court has not adopted the Danielson rule and does not apply it except where we are constrained to do so because the case before us is appealable to a Circuit Court which has adopted the rule. Otherwise we use the "strong proof rule," which requires a taxpayer to present more than the usual preponderance of the evidence in order to support a finding that the terms of a questioned instrument do not reflect the intention of the contracting parties. Elrod v. Commissioner, 87 T.C. 1046 (1986); Coleman v. Commissioner, 87 T.C. 178 (1986), affd. without published opinion 835 F.2d 303 (3d Cir. 1987); G C Services Corp. v. Commissioner, 73 T.C. 406 (1979). However, where as here the case before us is appealable to a Circuit Court which has adopted *258 the Danielson rule, we are constrained by Golsen to apply the rule unless we find that the terms of the questioned instrument are ambiguous, i.e., are subject to different interpretations. Where the terms of the agreement are ambiguous we have concluded that the Danielson rule is not applicable. Smith v. Commissioner, 82 T.C. 705, 713-714 (1984). This conclusion is consistent with the manner in which we treat ambiguity in a contract involved in a strong proof case. In such cases we have repeatedly found that the strong proof doctrine is not applicable where neither party attempts to vary the terms of a contract but both parties merely endeavor to have us construe obviously ambiguous terms in the light most favorable to their respective causes. Smith v. Commissioner, supra; see also Elrod v. Commissioner, 87 T.C. 1046 (1986). In Smith v. Commissioner, supra at 714, we found the requisite ambiguity from the "four corners" of an agreement including an addendum under which certain payments made by a *259 corporation to its stockholders could be construed as either (1) payments made for the stockholders' stock, a capital transaction on which the corporation would have no deduction and the stockholders would have a capital gain; or (2) as commissions, an ordinary income transaction on which the corporation would have a deduction and the stockholders would have ordinary income. In Smith we concluded that "Although the individual terms of the original agreement and addendum, when examined separately, appear clear, we find the language irreconcilable and hence ambiguous when the original agreement and addendum are applied and interpreted together." 82 T.C. at 714. In Elrod v. Commissioner, supra at 1066, we found a contract to be "very ambiguous" where it contained "language susceptible to interpretation either as an option agreement or as a completed sale." In the instant case the original agreement of November 6, 1972, as well as the assignment forms used to transfer the leases to Continental contain terms which denote a sale. Yet the original agreement and its subsequent amendments contain numerous provisions which are inconsistent with a *260 sale and more like the terminology usually found in financing arrangements. For instance, the original agreement required petitioners to annually furnish Continental with audited financial statements prepared by an independent firm of certified public accountants satisfactory to Continental (para. 8(a)(i)), and with unaudited quarterly statements (para. 8(a)(ii)). Petitioner was also required to permit Continental reasonable access to its accounting books and records (para. 8(b)), to maintain or cause to be maintained such insurance as is usually required in like businesses (para. 8(c)), and to timely pay all taxes and other liabilities (para. 8(d)). These provisions in particular, plus the tenor of all relevant documents and the overall conduct of the parties as set forth in our findings, are indicative of a loan relationship rather than a sale. Thus, the original agreement between petitioner and Continental as well as its supplements are clearly ambiguous on their face; and their exact nature for tax purposes must be determined from the documents as a whole in light of all the surrounding facts and circumstances. Therefore, neither Danielson nor the strong proof doctrine *261 is applicable to this case. Smith v. Commissioner, supra.
Respondent's second contention is that petitioner in this case is attempting to change its method of accounting without the permission of the Commissioner as required by section 446[2] and section 1.446-1(e)(2)(ii), Income Tax Regs.[3]Since this issue was not raised by respondent until shortly before the trial it is a new matter on which respondent has the burden of proof. Rule 142(a); Achiro v. Commissioner, 77 T.C. 881, 889-891 (1981). *262 We agree with petitioner that this issue is not one of timing as contemplated by section 446. Instead it is a question of characterization, i.e., whether the transfer by petitioner of the leases to Continental constituted sales or pledges for loans. As we stated in Underhill v. Commissioner, 45 T.C. 489, 496-497 (1966): The issue before us is the extent to which payments received by [the taxpayer] are taxable or nontaxable -- i.e., the character of the payment -- not the proper method or time of reporting an item the character of which is not in question. * * * [The taxpayer] had no choice in determining whether an obligation was speculative or nonspeculative, nor was there any doubt or choice about the method or time of reporting income once that determination was made. Again, in Standard Oil Co. (Indiana) v. Commissioner, 77 T.C. 349, 383 (1981), we concluded in an analogous situation that: The inquiry before us, in the first instance, concerns the character of the payments in issue, though our decision on that issue ricochets quickly into the timing issue. In reality, petitioner has no choice * * * in determining whether *263 to deduct the costs before us. In such cases, the strictures of section 446(e) do not apply. [Emphasis in original.] In the case before us, as in Underhill and Standard Oil, there is no timing issue to which section 446 is applicable because the determination of timing will automatically follow from the outcome of the character issue. If petitioner fails in its attempt to have the transfers characterized as pledges, petitioner must recognize the funds received in exchange as ordinary income in the year of the transfers. If petitioner succeeds in its characterization of the transfers as pledges, the rents from the leases are recognized by petitioner when paid by the lessees. Although there is a timing consequence to the outcome of the characterization, it is automatically determined by the characterization and no change of accounting within the meaning of section 446 is involved. Finally respondent contends that petitioner's transfer of its equipment leases to Continental constituted sales and not secured financing as contended by petitioner. The parties agree that the resolution of this issue depends on a determination of which party had the benefits and burdens *264 of ownership of the leases after their transfer to Continental. Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1237 (1981). Some of the factors which are usually considered in determining which party has such benefits and burdens are: (1) whether legal title passes to the transferee; (2) how the transaction was treated by the parties; (3) whether the transferee acquired an equity in the property; (4) whether the relevant documents created a present obligation on the transferor to deliver a deed or other evidence of title and a present obligation on the transferee to make payments; (5) whether the right of possession is vested in the transferee; (6) which party is required to pay property or other taxes on the property; (7) which party has the risk of loss or damage to the property; and (8) which party is entitled to the profits from any subsequent use, operation, or sale of the property. See Grodt & McKay Realty, Inc. v. Commissioner, supra at 1237-1238 and cases cited therein. These factors are discussed below. Initially petitioner *265 treated its leases as sales both in its accounting records and on its income tax returns. However, during respondent's audit petitioner took the position that the leases were not sales but leases and that the transfer of the leases to Continental constituted pledges for financing purposes. Respondent agreed that the leases were not sales when initially entered into but that the transfers to Continental were sales. Throughout its dealings with petitioner Continental treated the transactions with regard to the leases in the same manner as it treated secured loans. In this case, it is doubtful that Continental acquired any equity in the leases inasmuch as petitioner in practice was permitted to reacquire any lease for any reason. Under these circumstances it is apparent that Continental's interest in the leases was limited to that of a secured lender since it was primarily interested in the leases as security for the money advanced to petitioner and on which Continental received a discount which approximated its prime interest rate at the time of the transaction. Under the agreement between petitioner and Continental, petitioner was obligated to insure and pay taxes on the equipment *266 underlying the leases. The leases, however, required the lessees to keep the leased equipment insured and to pay any taxes thereon. Consequently, neither petitioner nor Continental actually insured or paid any taxes on the leased equipment but petitioner was required under its agreement with Continental to see that the lessees fulfilled their responsibilities under the leases, including of course the payment of insurance and taxes. The record does not reflect that there was any insurance or taxes on the leases. The relative extent to which each party to a questionable transaction has potential for profit or loss with respect to the property involved is a "significant factor" to be used in determining ownership of the property. Illinois Power Co. v. Commissioner, 87 T.C. 1417, 1437 (1986). In this case Continental's potential loss with respect to any lease was limited by petitioner's contractual obligation to correct any default in a lease or to reacquire any lease in which a default could not be corrected. Where a reacquisition was necessary petitioner was required to repay Continental the discounted current value of the remaining rental payments. Consequently, *267 petitioner had the risk of loss in case of a default by a lessee and Continental could suffer a loss only if petitioner was unable or unwilling to reacquire a lease in default. This never occurred during the years under consideration. Furthermore, even though petitioner's risk of loss was limited by amendments to the letter agreement to 50 percent of the unpaid balance of the leases transferred in any year after 1973 and before 1977 and to $ 10 million in each of the years 1977 and 1978, neither petitioner nor Continental considered these limitations significant since as a general rule the leases were for terms of only five years or less with an average term of two and one half years. In fact in its acquisition of the leases Continental relied primarily on the creditworthiness of petitioner and considered the leases as collateral. We also note that Continental's rate of return on the transactions with petitioner was limited to the initial discounts which were comparable in amount to the interest rate earned by Continental on secured loans. In Illinois Power Co. v. Commissioner, 87 T.C. at 1438, we found that such *268 a fixed rate of return for a purported purchaser, in contrast to the profit and loss possibilities of the purported seller, in a similar situation, was a significant factor in determining which party had the greatest risk of loss. In several other cases dealing with municipal bonds purportedly sold to banks subject to repurchase agreements, a fixed rate of return to the banks in the nature of interest was considered indicative of a secured lending arrangement and not a sale. See First American National Bank of Nashville v. United States, 467 F.2d 1098, 1101 (6th Cir. 1972); Union Planters National Bank of Memphis v. United States, 426 F.2d 115, 118 (6th Cir. 1970); American National Bank of Austin v. United States, 421 F.2d 442, 452-453 (5th Cir. 1970). In United Surgical Steel Co. v. Commissioner, 54 T.C. 1215, 1229-1230 (1970), we also considered such facts of significance in finding a transaction to be a secured financing arrangement rather than a sale. Finally, even though their agreement did not contain a specific provision for such action, in practice the parties in this case permitted petitioner to reacquire *269 leases at any time and for any reason. This practice allowed petitioner complete freedom in its dealings with the lessees in order to take advantage of up-grades, trade-ins and other profitable transactions. We found a similar situation to be "most significant" in Illinois Power Co. v. Commissioner, supra at 1439. See also Union Planters National Bank of Memphis v. Commissioner, supra at 117. In final analysis the record before us contains no evidence that Continental ever suffered any loss on any of the numerous transactions with petitioner. The record also fails to reflect that Continental ever realized any income whether or not at a net economic gain on any of such transactions except the "discounts" provided in the Agreement of November 1972 which discounts were approximately equal to the amount of interest being currently earned by Continental on its secured loans. We are satisfied, therefore, that with respect to the leases the benefits and burdens of ownership remained in petitioner and that, viewed as a whole, the transactions between petitioner and Continental constituted a financing arrangement. Accordingly the assignment of the leases *270 in this case amounted to pledges to secure loans and not sales as determined by respondent. Warranty Expenses. We have previously considered the issue of whether one taxpayer is entitled to deduct under section 162 reimbursements made to a wholly-owned subsidiary or other related party for business expenses incurred by the latter. In Austin Co. v. Commissioner, 71 T.C. 955, 966-968 (1979), the taxpayer corporation reimbursed a wholly-owned Mexican subsidiary for Mexican employment taxes incurred by the subsidiary with respect to certain personnel which the subsidiary shared with the parent. The Commissioner disallowed the deduction by the parent of the subsidiary's portion of the Mexican employment taxes and we rejected the parent's contention that the taxed personnel were loaned to the Mexican subsidiary in order to safeguard the parent's foreign investment and concluded as follows: No doubt this relationship enhanced the successful operation of [the subsidiary] which benefited [the parent] as its owner, but this type of indirect and incidental benefit is not enough to justify [the parent's] deduction. Columbian Rope Co. v. Commissioner, [42 T.C. 800 (1964)] *271 at 815-816. [The parent] simply cannot claim as its own expense, amounts paid for activities that were concerned with the day-to-day operation of the subsidiary's business. Young & Rubicam, Inc. v. United States, [187 Ct. Cl. 635, 410 F.2d 1233 (1969)] at 1239. [71 T.C. at 967-968.] In Austin Co. v. Commissioner, supra we also found that the taxpayer had failed to establish that the Mexican taxes were ordinary and necessary expenses of the parent. We noted at 71 T.C. 968 that the test to determine whether an expense is ordinary and necessary is whether a hardheaded businessman, under the circumstances, would have incurred the expense, as stated in B. Forman Co. v. Commissioner, 453 F.2d 1144, 1160 (2d Cir. 1972), cert. denied 407 U.S. 934 (1972). We then concluded that the payment by the parent of "the Mexican taxes relative to the technical personnel was a gratuity; a payment incurred [by the parent] simply to aid its wholly owned subsidiary. This is hardly an expense an *272 astute businessman would incur in an unrelated arm's-length transaction." Austin Co. v. Commissioner, supra at 968. In Columbian Rope Co. v. Commissioner, 42 T.C. 800 (1964), we found that a parent corporation was not entitled to deduct one half of the salaries and related expenses paid to certain employees of a wholly-owned subsidiary in order to induce such employees to accept work in the Philippine Islands because: We believe the record clearly shows that [the parent] undertook these payments simply to aid its wholly owned foreign subsidiary to obtain the services of needed management personnel. A successful operation of the foreign subsidiary, through the services of such personnel, would obviously inure to the benefit of the * * * parent corporation. [The parent's] willingness to undertake this obligation is understandable. But we do not believe that these dollar payments of salaries and related payments can be construed as [the parent's] own business expense * * * Columbian Rope Co. v. Commissioner, supra at 815-816. However, in Fishing Tackle Products Co. v. Commissioner, 27 T.C. 638 (1957), *273 a parent corporation deducted reimbursements made to a subsidiary for operating losses incurred in the manufacture of a patented fishing rod. We noted that the subsidiary was the parent's sole supplier of that particular rod and that the reimbursements constituted ordinary and necessary business expenses incurred by the parent in order to maintain and preserve this source of supply and we allowed the deduction by the parent. In Snow v. Commissioner, 31 T.C. 585 (1958), a law firm, which derived a substantial portion of its income from preparing abstracts and rendering title opinions for mortgage lenders, organized a savings and loan association and agreed to reimburse the association for operating losses incurred during its first three years. We concluded that the law firm's reimbursements of the association's operating losses were proximately related to the law firm's business and thus deductible by it as ordinary and necessary expenses. In doing so we stated: In the sense in which the word "necessary" has been defined as "appropriate and helpful," in our view this expenditure was necessary. The term does not mean indispensable. In our opinion, it is sufficient *274 if there are "evident business ends to be served, and an intention to serve them appears adequately from the record." B. Manischewitz Co., 10 T.C. 1139, 1145 (1948). Likewise, the concept of "ordinary" under the Code does not require that the expenditures be either habitual or normal in the sense that the taxpayer either makes or is required to make them often. We think that the legal connotation of the word "ordinary," as defined in Welch v. Helvering, supra, includes the nurturing of a savings and loan association through infancy, under the special circumstances involved herein. Snow v. Commissioner, supra at 591-592. Again in Fall River Gas Appliance Co. v. Commissioner, 42 T.C. 850 (1964), affd. 349 F.2d 515 (1st Cir. 1965), a parent corporation, Fall River Gas Company, was engaged in the sale and distribution of gas; while its wholly-owned subsidiary, Fall River Appliance Company, sold and leased gas-fired appliances. Certain selling, installation, and delivery expenses were incurred by the subsidiary with respect to gas appliances but were paid and deducted by the parent. The Commissioner *275 disallowed the deduction by the parent but we concluded as follows: Ordinarily, the separate corporate identities of parent and subsidiary preclude the parent from deducting expenses incurred or losses sustained by its subsidiary. The theory is that the payment by the parent to cover such expenses or losses is related to the business of the subsidiary and not to its own business. Interstate Transit Lines v. Commissioner, 319 U.S. 590. Accordingly, if this were the usual situation of a parent paying expenses of its subsidiary, the deduction would have to be disallowed. * * * However, the situation here is different. The gas company had a substantial interest in increasing its own [emphasis in original] sales of gas, and the expenses paid by it were intended to promote its own business wholly apart from that of the subsidiary. This distinction was explicitly noted in Interstate Transit Lines, supra at 594, and was regarded as pivotal by this Court in Fishing Tackle Products Co., 27 T.C. 638, 644. We think that the expenditures * * * which *276 would have the quality of deductible expenses if made by the subsidiary, are similarly deductible by the parent when paid [fn. ref. omitted] by the parent because directly related to its business * * * Fall River Gas Appliance Co., supra at 858. When the principles set forth and discussed in each of the above opinions are applied to the factual situation before us we are satisfied from our factual findings that the warranty expenses incurred by CEC and reimbursed by petitioner during 1974 through 1978 were directly related to petitioner's business and therefore are deductible under section 162 by petitioner. From our findings it is apparent that in the 16 years of its business life prior to 1974 petitioner had carefully built, nourished, and protected a reputation not only for manufacturing and selling good products but also for providing in the United States excellent service with respect to such products after their sale. It is equally apparent that due to the close proximity of the two markets, petitioner's reputation for such service in the United States would not only favorably affect the sale of its products in Canada but a failure by CEC to provide similar *277 services in Canada would adversely affect petitioner's future sales in both Canada and the United States. We are also impressed by petitioner's contention that under the circumstances it was beneficial both to CEC and petitioner for petitioner to bear the warranty expenses of petitioner. As set out in our findings, the cost of such expenses was greater in Canada due to the difference in the density of the population and such additional costs would be easier to bear, and of greater benefit to, the well established parent than the newly organized subsidiary. Furthermore, we agree with the conclusion of petitioner's officers that the payment by petitioner of the warranty expenses was a logical manner of insuring that the funds were used as intended, i.e., for warranty services. We conclude, therefore, that under the circumstances set forth in our findings the warranty expenses are deductible by petitioner. However, as noted in Fall River Gas Appliance Co., 42 T.C. at 858 n.2, the expenses are deductible by only one of the parties, i.e., the party which paid them in the years under consideration. Consequently, petitioner's deductions are limited to the reimbursements *278 of CEC's warranty expenses for 1974, 1977, and 1978 since the warranty expenses for CEC for 1975 and 1976 were ultimately paid by CEC as evidenced by petitioner's concession with respect to these years and the allowance of the deductions for these years to CEC by the Canadian Competent Authority. To reflect concessions by the parties, Decisions will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Section 446 reads in pertinent part as follows: (a) GENERAL RULE. -- Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books. * * * (e) REQUIREMENT RESPECTING CHANGE OF ACCOUNTING METHOD. -- Except as otherwise expressly provided in this chapter, a taxpayer who changes the method of accounting on the basis of which he regularly computes his income in keeping his books shall, before computing his taxable income under the new method, secure the consent of the Secretary. ↩
3. The pertinent part of section 1.446-1(e)(2)(ii), Income Tax Regs., is as follows: (a) A change in the method of accounting includes a change in the overall plan of accounting for gross income or deductions or a change in the treatment of any material item used in such overall plan. * * * A material item is any item which involves the proper time for the inclusion of the item in income or the taking of a deduction. * * * (b) A change in method of accounting does not include correction of mathematical or posting errors, or errors in the computation of tax liability * * *. Also, a change in method of accounting does not include adjustment of any item of income or deduction which does not involve the proper time for the inclusion of the item of income or the taking of a deduction. For example, corrections of items that are deducted as interest or salary, but which are in fact payments of dividends, and of items that are deducted as business expenses, are not changes in method of accounting. * * *↩